STEVE HORN, Appellant, v INTERNATIONAL BUSINESS MACHINES CORP. et al., Respondents.

Second Department, August 26, 1985

**APPEARANCES OF COUNSEL**

*Sive, Paget & Riesel, P. C.* (*Daniel Riesel* and *Mark A. Chertok* of counsel), for appellant.

*Windels, Marx, Davies & Ives* (*Raymond T. Munsell* and *Todd B. Sollis* of counsel), for International Business Machines Corporation, respondent.

*Lawrence Dittelman, Town Attorney,* for Town of New Castle and others, respondents.

*Meighan & Necarsulmer (Garrison R. Corwin, Jr.,* of counsel), for Coalition of Concerned Neighborhood Associations, Inc., *amicus curiae.*

## OPINION OF THE COURT

MOLLEN, P. J.

■ The instant declaratory judgment action involves a series of challenges to the rezoning and subdivision of several parcels of land located in the Town of New Castle, which permit the construction on that property of a research center by defendant International Business Machines Corporation (IBM). The primary issue presented on this appeal is whether the draft and final environmental impact statements prepared and submitted by IBM in conjunction with its rezoning application failed to comply with the requirements of the State Environmental Quality Review Act (SEQRA; ECL art 8). Upon a review of the record, we conclude that the proceedings herein were in compliance with SEQRA.

### I. THE FACTS

Sometime prior to July 1982, IBM acquired options to purchase several parcels of real property totaling in excess of 185 acres, located in the western end of the Town of New Castle (hereinafter the IBM site). The principal parcel of the assembled IBM site was the former location of the Hudson Hills Golf Course which had been on the market for several years. The entire IBM site was zoned for residential use with a minimum required acreage of two acres. IBM intended to develop the site by constructing a research office center upon it. Plaintiff's residence is located on a parcel of approximately 85 acres which is contiguous to a portion of the western boundary of the IBM site.

In July 1982, IBM first approached town officials for the purpose of reviewing the procedures necessary to rezone the IBM site for possible office development. IBM was advised at that time to prepare a draft generic environmental impact statement (DGEIS) for submission to the town in support of its rezoning application. The following month, IBM made a formal presentation to the town officials at IBM's research office center located in Yorktown, approximately 1½ miles from the proposed New Castle IBM site. During the presentation, aerial photographs of the site and slides of other IBM buildings were displayed. IBM indicated that the proposed New Castle facility

would be similar in function to the Yorktown center. A similar presentation was made to several New Castle residents at IBM's invitation, in September 1982.

In November 1982, IBM formally petitioned the town to rezone the IBM site to a zoning classification which would permit the construction of a research office center, planned for 800,000 square feet of space and approximately 1,600 to 1,800 employees. In addition thereto, IBM submitted a DGEIS.

IBM's zoning application and DGEIS were formally received and filed by the Town Board on November 23, 1982. The Town Board declared itself to be the "lead agency" in connection with the proposed project, pursuant to SEQRA regulations (see, 6 NYCRR 617.2 [r]) and IBM's rezoning request was categorized as a "Type I [SEQRA] action" (see, 6 NYCRR 617.2 [z]). The Town Board also made a "Positive Declaration" that the proposed action would have a significant effect on the environment thereby necessitating a full environmental review before the Board could vote on the rezoning request. IBM was then asked to have representatives attend the Town Board hearing on December 14, 1982, to make a formal presentation.

At the December 14, 1982 meeting of the Town Board, IBM's architectural and engineering consultants as well as IBM's attorney made presentations concerning the proposed project. Thereafter, IBM was questioned by members of the Town Board on issues concerning the visual impact of the proposed project, potential traffic problems and related matters. At the conclusion of the meeting, the Town Board accepted the DGEIS and ordered that it be circulated to all appropriate agencies.

On December 21, 1982, IBM submitted an application to the Town Planning Board for approval of preliminary subdivision of the IBM site into two parcels, one of approximately 185 acres, which was the subject of the proposed rezoning, and a parcel of about 6 acres which was not to be rezoned. In accordance with the objective of SEQRA that the environmental review process be integrated into existing agency review to the maximum degree feasible (see, ECL 8-0107), the Town Board, at its regular meeting on January 11, 1983, scheduled a joint meeting with the Planning Board to be held on February 7, 1983. The dual purposes of the joint meeting were to first conduct a public hearing before the Town Board on the DGEIS and the rezoning request, and second, to conduct a public hearing before the Planning Board regarding consideration of IBM's subdivision request and a related amendment to the town plan map.

At the joint meeting, the IBM representative again made a presentation regarding the proposed development. Following the presentation, members of both Boards, as well as several residents who attended the meeting, raised questions and comments on a variety of issues including potential traffic and sewage problems, visual impact and archeological concerns, the use of mechanical equipment on the roof of the proposed facility, and the type of research to be conducted therein. At the conclusion of the hearing, it was announced that further comments from the public would be accepted by the Town Board until February 28, 1983. This deadline was subsequently extended by the Town Board.

Thereafter, at its regular meeting on February 15, 1983, the Planning Board determined that the IBM subdivision proposal was in accordance with the long-range planning policies for research and office business development as set forth in the town plan and that the proposed site complied with the planning standards established in that plan. Accordingly, the Planning Board voted to amend the town plan map to reclassify the IBM site from the then "Semi-Public Recreation" and "Low Density Residence" categories to the "Office Building" category and to approve IBM's subdivision application. The Planning Board based its determination on advice requested and received from its planning consultant and the town engineer, its review of the DGEIS, as well as the comments and reports subsequently considered in connection therewith.

The Town Board conducted two additional meetings to review and consider public comment on IBM's rezoning request. These meetings were held on March 8 and 22, 1983. At the conclusion of the March 22 hearing, the Board voted to close the public comment period as to the DGEIS and directed IBM to prepare a final generic environmental impact statement (FGEIS). At a subsequent meeting held on April 12, 1983, the Town Board scheduled a public hearing for May 16, 1983, to review the FGEIS which IBM was asked to file by May 5, 1983. When area residents requested more time to respond, IBM agreed to deliver the FGEIS by April 30, 1983. The FGEIS was filed on April 29, 1983.

The May 16, 1983 public hearing opened with a presentation by IBM which consisted of an outline of the proposed project and a review of the FGEIS. IBM underscored the fact that several new studies were appended to the FGEIS which were not included in the DGEIS. These studies included (1) a survey of archeological sites located on the parcel, (2) an assessment of air

quality at the Yorktown IBM center, (3) a supplemental traffic study, and (4) a study by a real estate firm concluding that the Yorktown IBM center had no adverse impact on property values in neighboring areas.

Several area residents and representatives of local not-for-profit organizations attended the meeting and voiced objections to the proposed development. Most of the objections concerned the potential impact of the proposed project on the rural environment of the town, increase in traffic and possible increases in noise levels. In addition, an environmental planner retained by plaintiff testified in opposition to IBM's proposal, claiming, in essence, that the FGEIS was not in compliance with relevant SEQRA requirements. Among the objections raised by the planner were the claims that the FGEIS failed to adequately discuss alternative sites within the town for the proposed development and that it did not sufficiently consider the impact of the zoning change on the entire New Castle community.

At the conclusion of the meeting, the Town Board determined that it required further information on traffic projections, revenue projections and the tax impact of the proposed project. In addition, the Board requested an addendum to the FGEIS to address the possibility of a reduction in the ultimate allowable size of the building.

In response to the Town Board's request for further information, IBM submitted two letters from its engineer and site planner, dated May 20 and May 21, 1983, respectively, as addenda to its FGEIS. At its next scheduled meeting on May 24, 1983, the Town Board accepted the FGEIS and its addenda as complete, and ordered that the FGEIS as so supplemented be circulated for comment. The Town Board also voted to accept written public comments on the FGEIS until June 17, 1983. Final determination of IBM's rezoning application was deferred until June 22, 1983.

On June 21, 1983, the Town Planning Board convened and voted to ratify its February 15, 1983 resolution amending the town plan map to change the permitted land use for the IBM site from residential to office use. In addition, the proposed subdivision of the site was approved.

On the following day the Town Board voted to approve IBM's rezoning application. In addition to making its requisite findings pursuant to SEQRA, the Board adopted two resolutions. The first amended the zoning provisions of the town code to create a new research and office business zone classification with a minimum required acreage of 150 acres, minimum yard

setbacks, maximum employee population, maximum building height and parking restrictions. The second resolution rezoned the IBM site from its residential classification to the new research and office business classification.

In July 1983, the plaintiff commenced the instant declaratory judgment action seeking to have the two zoning resolutions passed by the Town Board declared invalid. In the first instance, plaintiff claimed that the DGEIS and FGEIS relied upon by the Town Board failed to comply with the substantive requirements of SEQRA. In addition, plaintiff alleged that the zoning amendments contravened the community's comprehensive plan which sought to maintain the rural and low density residential character of the town's western end.

Upon motions by IBM and the town and Town Board, Special Term granted summary judgment in their favor and dismissed the complaint. In its decision, Special Term underscored the fact that the matter had been the subject of approximately 20 hearings and was thoroughly discussed in the comprehensive DGEIS and FGEIS submitted by IBM. Applying the deferential standard of judicial review applicable to SEQRA matters, Special Term concluded that the Town Board had "complied with the stated purpose of SEQRA and [had] taken a 'hard look' at the environmental considerations presented" and thus, "[t]he actions taken by the Town Board cannot be said to have been arbitrary, capricious or unreasonable". We agree and accordingly affirm.

## II. SEQRA CLAIMS

*Applicable Standard of Judicial Review*

At the outset, it is necessary to emphasize that the standard of judicial review for challenges involving substantive compliance with SEQRA guidelines is limited. While literal compliance with SEQRA's procedural requirements for integrating environmental considerations into the decision-making process is mandated (*see, Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay,* 88 AD2d 484, 490-491; *Matter of Rye Town/King Civic Assn. v Town of Rye,* 82 AD2d 474, 480-481, *appeals dismissed* 55 NY2d 747), the courts have allowed State or local "lead agencies" considerable latitude in the exercise of discretion on substantive environmental matters (*Aldrich v Pattison,* 107 AD2d 258). In *Aldrich (supra,* at p 267), this court, in an opinion authored by Justice Rubin, explained:

"SEQRA allows an administrative agency or governmental body considerable latitude in evaluating the environmental

impacts and alternatives discussed in an environmental impact statement to reach a determination concerning a proposed project. 'While an [environmental impact statement] does not require a public agency to act in any particular manner, it constitutes evidence which must be considered by the public agency along with other evidence which may be presented to such agency * * * Thus the general substantive policy of the act is a flexible one. It leaves room for a responsible exercise of discretion, and does not require particular substantive results in particular problematic instances' (*Matter of Town of Henrietta v Department of Envtl. Conservation,* 76 AD2d 215, 222, *supra,* cited with approval in *Coalition Against Lincoln W. v City of New York* [94 AD2d 483, 492, *affd* 60 NY2d 805]; *see also, Grazing Fields Farm v Goldschmidt,* 626 F2d 1068, 1072).

"In reviewing any agency's determination on environmental matters, this court has held that the familiar standard of review for proceedings pursuant to CPLR article 78 is applicable. Thus, the court may only annul a determination as to the sufficiency of an environmental impact statement and the environmental consequences of the proposed project 'if it is not rational — if it is arbitrary and capricious or unsupported by substantial evidence' (*Town of Hempstead v Flacke,* 82 AD2d 183, 187; *see, Matter of Pell v Board of Educ.,* 34 NY2d 222; *Matter of Environmental Defense Fund v Flacke,* 96 AD2d 862, *supra*)."

Thus, if the record establishes that the responsible agency has taken a "hard look" at the relevant areas of environmental concern, and has made a reasoned judgment, the agency's determination will not be disturbed (*Aldrich v Pattison, supra,* at pp 265-266; *H.O.M.E.S. v New York State Urban Dev. Corp.,* 69 AD2d 222, 232).

*Analysis of Alternative Locations*

The plaintiff argues that the DGEIS and FGEIS submitted by IBM were insufficient under SEQRA because the statements failed to adequately discuss alternative locations within the town for the proposed project.

The statutory and regulatory guidelines pertaining to the contents of an environmental impact statement (EIS) require that it include an analysis of reasonable alternatives to the proposed action. For example, ECL 8-0109 (4) provides that a draft EIS shall "describe the proposed action and reasonable alternatives to the action, and briefly discuss, on the basis of information then available, the remaining items". A similar requirement exists for the final EIS (*see,* ECL 8-0109 [2] [d]).

The SEQRA regulations further amplify these requirements by stating that "[t]he body of all draft and final EIS's shall at least contain the following * * * a description and evaluation of reasonable alternatives to the action which would achieve the same or similar objectives. (The description and evaluation should be at a level of detail sufficient to permit a comparative assessment of the alternatives discussed * * *)" (6 NYCRR 617.14 [f] [5]).

In the instant case, the DGEIS submitted by IBM contained an analysis of alternative uses of the site in question, namely: (1) "[n]o action" or maintaining the site in its present use, (2) developing the parcel for single-family housing consistent with existing zoning; (3) multifamily development, and (4) general office development.

The FGEIS incorporated the information contained in the DGEIS with respect to alternative uses of the IBM site. The FGEIS also included a reference to other large parcels of property in New Castle which might be considered for the project. In the FGEIS, IBM stated that the identified parcels were not more appropriate for development by IBM than the Hudson Hills site for a variety of reasons. For example, at least one of the alternative parcels had been intended for development by another developer. Moreover, IBM emphasized that the potential environmental impact of the proposed project that would flow from any of the alternative sites would not vary in any substantial respect from that identified in the instant site. And finally, it was noted that none of the alternative sites was zoned to permit the proposed IBM development.

Contrary to the plaintiff's position, we conclude that both the FGEIS and DGEIS complied with the SEQRA guidelines, which required a discussion of reasonable alternatives to the proposed action. It is well established that the SEQRA requirements governing the contents of an EIS must be construed in light of the rule of reason. "Not every conceivable environmental impact, mitigating measure or alternative must be identified and addressed before a FEIS will satisfy the substantive requirements of SEQRA (*see, Coalition Against Lincoln W. v City of New York, supra*, p 491; *Matter of Environmental Defense Fund v Flacke, supra*) * * * The degree of detail with which each factor must be discussed will vary, of course, with the circumstances and nature of each proposal (*Webster Assoc. v Town of Webster*, 59 NY2d 220, 228; *accord, Life of Land v Brinegar*, 485 F2d 460, 473, *cert denied* 416 US 961). We reiterate that the rule is one of reasonableness and balance (*see, Coalition Against Lincoln W. v City of New York, supra*)" (*Aldrich v Pattison, supra*, at p 266).

In fact, this rule of reason is incorporated in the relevant SEQRA statutory and regulatory guidelines governing the contents of an EIS; that is, the statutes and regulations merely require a discussion of "reasonable alternatives to the [proposed] action" (*see,* ECL 8-0109 [4] [2] [d]; 6 NYCRR 617.14 [f] [5]).

In determining whether the discussion contained in an EIS regarding alternatives to the proposed action, especially the matter of alternative locations, is sufficient under SEQRA guidelines, a crucial factor to consider is whether the applicant is a private developer or a governmental agency. The importance of this distinction lies in the fact that governmental agencies possess the power of eminent domain and, hence, have a much broader range of alternative sites available to them than does a private developer. Private developers are limited in their choice of alternative sites. Their selection will be dictated by their own economic resources, by the prevailing trends in the real estate market, and, very simply, by what suitable sites are actually available for acquisition. In addition, an important distinction lies in the fact that prior to the institution of necessary SEQRA proceedings, a private developer either owns or has in most cases already committed itself, conditionally or otherwise, to the purchase of a particular parcel of land. Thus, here, the private developer's proposed project has been limited to the particular parcel for which it has obtained purchase options. It would be unrealistic, and, indeed, onerous to impose upon private developers the obligation to acquire alternative sites or options to purchase them and then submit all the sites to the lead agency for review and selection. A private corporation does not have eminent domain power to permit it the flexibility of choice which is available to a municipality (*see, Webster Assoc. v Town of Webster,* 112 Misc 2d 396, 410-411, *affd* 85 AD2d 882, *revd on other grounds* 59 NY2d 220).

In certain cases involving proposed development by a private entity an in-depth analysis and discussion of alternate sites for the project may be appropriate and necessary. For example, where two or more competing private entities are striving to obtain approval from a municipality for a particular type of proposed development (such as a shopping mall) on different sites, such discussion and analyses of the different sites, in terms of environmental impact, would certainly be appropriate (*see, Webster Assoc. v Town of Webster, supra*). However, we emphasize again that it would be an illogical and unwarranted extension of SEQRA to require every private developer to address in its EIS the possible development of other sites over which it has no control, which might not be for sale, or which are

not economically feasible. Such a result would clearly contravene the "rule of reason" governing SEQRA's substantive requirements.

Judged by these standards, the DGEIS and FGEIS submitted by IBM pass the test for compliance with SEQRA's "reasonable alternative" requirement. Both statements discussed potential alternative uses of the subject parcel. In addition, the FGEIS identified certain other parcels within the town but indicated that the parcels over which IBM had no control were inappropriate alternatives for the project because of a variety of stated reasons. The only appropriate and available site for the proposed project was that which is the subject of the instant litigation. Based on the facts of this case, the absence of a detailed analysis of alternative sites was not improper and did not violate SEQRA.

*Analysis of Impact on the Entire New Castle Community*

By its nature, a generic or programmatic EIS, as opposed to a site specific EIS, is utilized in cases, such as this, which involve "new, existing or significant changes to existing land use plans, development plans and zoning regulations" (6 NYCRR 617.15 [d]). A generic EIS is thus intended to be broad and general in its discussion of the impact of the proposed action on the entire community and the constraints and consequences of any narrowing of future options (*see,* 6 NYCRR 617.15 [d] [1]).

In the instant case, plaintiff argues that the DGEIS and FGEIS were inadequate because the statements allegedly failed to assess the impact of the proposed IBM project and related zoning amendments upon the entire New Castle community. We disagree.

The DGEIS and FGEIS are replete with lengthy studies, analyses and discussions of the potential impact of the proposed project and zoning changes on the surrounding areas. Moreover, serious consideration was given to the issue of whether the proposed action was in accordance with the New Castle town plan. For example, the FGEIS specifically underscored the fact that the town plan "includes a policy of encouraging a limited amount of business office, research and industrial development in carefully selected locations and with high standards of design". The FGEIS noted further that "[t]he impact of the zoning change is described and assessed comprehensively and in detail throughout the DGEIS and FGEIS. Since the town Plan contemplates only a limited amount of business, office, research, and industrial development in carefully selected locations, the im-

pact of the zoning amendment will be to discourage further commercial development west of the Taconic Parkway".

In addition to the information contained in the FGEIS and DGEIS, the record of the proceedings before the Town Board clearly reflects the fact that the Board took a "hard look" at the consequences of the proposed project and zoning change on the entire New Castle community and its long-range zoning policy. Based on the record before us, it cannot be said that the Town Board's determination on IBM's proposal was arbitrary, capricious or irrational (*Aldrich v Pattison,* 107 AD2d 258, *supra*).

*Alleged New Information Contained in the FGEIS*

Plaintiff further contends that the FGEIS submitted by IBM contained significant new information which should have been recirculated as a supplement to the DGEIS in order to enable the relevant agencies to make an informed decision on the project.

The law recognizes that in situations in which significantly new information has been discovered subsequent to the filing of a draft EIS, which new information is relevant to the environmental impact of the proposed action, a supplemental EIS containing this information should be circulated to the relevant agencies so as to insure that the decision-making authorities are well informed (*Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay,* 88 AD2d 484, *supra*). In this regard, the courts have cautioned that the omission of required information from a draft EIS cannot be cured by simply including the required data in the final EIS since the abbreviated comment period for the final EIS "is not a substitute for the extended period and comprehensive procedures for public and agency scrutiny of and comment on the draft EIS" (*Webster Assoc. v Town of Webster,* 59 NY2d 220, 228, *supra*). If, however, the information omitted from the draft EIS was subject to extensive public scrutiny and discussion during the SEQRA proceedings, the absence of this data from the draft EIS is not to be considered a fatal defect (*Webster Assoc. v Town of Webster, supra,* at p 229).

In the instant case, we conclude that the allegedly new information contained in the FGEIS was not sufficiently novel or probative as to require a circulation of a supplemental DGEIS. Most or all of the additional information in question was merely an amplification of that which was contained in the DGEIS and that which was raised in the public hearings on the proposed action. Moreover, even assuming that this additional information was worthy of a supplemental DGEIS, the failure to circulate it was not fatal since it is clear that the FGEIS was subject

to the same public scrutiny and discussion as the DGEIS. In fact, the FGEIS was given far greater public scrutiny than required by SEQRA. Under the regulatory scheme, a minimum 10-day period for public comment on a FGEIS is prescribed before a decision on the proposed action can be made (6 NYCRR 617.9 [a]). In the case at bar, the FGEIS was filed on April 29, 1983, and the document was available for public comment for over three weeks, which period included an extensive public hearing on May 16, 1983. Moreover, following its approval of the revised FGEIS on May 24, 1983, the Town Board accepted additional public comments thereon until June 17, 1983, several days prior to the June 22, 1983 approval of the IBM project.

## Abdication of the Town Board's SEQRA Responsibilities

Plaintiff contends that the entire SEQRA proceeding in this case was an elaborate charade in that the Town Board wrongfully delegated its SEQRA responsibilities to assess the proposed action to IBM and merely "rubber-stamp[ed]" every proposal made by it. A review of the record in this case clearly reflects the lack of merit in plaintiff's position.

As discussed previously, the Town Board actively reviewed and considered the potential environmental impact of the proposed IBM project and zoning amendments. Moreover, the matter was the subject of numerous meetings and significant public debate. Rather than rubber-stamping IBM's proposal, the Town Board modified IBM's original proposal and placed significant restrictions on the project such as maximum building height, minimum setbacks and parking regulations. Each of these restrictions was the direct result of the Town Board's review of the rezoning proposal and extended public debate. Thus, it is clear that there was no abdication of the Town Board's SEQRA responsibilities.

### III. CONSISTENCY OF THE ZONING AMENDMENTS
#### WITH NEW CASTLE'S COMPREHENSIVE PLAN

In addition to the aforesaid challenges to the Town Board resolutions based on SEQRA guidelines, plaintiff claims that the zoning amendments are inconsistent with the town's comprehensive plan regarding the development of the New Castle community in that they allegedly fail to safeguard the area's rural and residential environment.

Town Law § 263 mandates that zoning regulations be enacted in accordance with the community's comprehensive plan. The rationale behind this statutory requirement was explained in *Udell v Haas* (21 NY2d 463, 469), which dealt with an identical

statutory provision in the Village Law, as follows: "[C]onsideration must be given to the needs of the community as a whole. In exercising their zoning powers, the local authorities must act for the benefit of the community as a whole following a calm and deliberate consideration of the alternatives, and not because of the whims of either an articulate minority or even majority of the community * * * Thus, the mandate of the Village Law (§ 177) [currently Village Law § 7-704] is not a mere technicality which serves only as an obstacle course for public officials to overcome in carrying out their duties. Rather, the comprehensive plan is the essence of zoning * * * It is the insurance that the public welfare is being served and that zoning does not become nothing more than just a Gallup poll."

Contrary to plaintiff's position, a review of the New Castle town plan indicates that the zoning resolutions passed by the Town Board are entirely consistent with that plan. The town plan, while seeking to maintain the residential and rural environment of the area, also anticipates limited business development in the town. Thus, it states:

"There should be encouraged a limited amount of other types of business uses, such as executive offices and research laboratories, which should be reasonably regulated and controlled. Where permitted such uses should be located on sites of adequate size, having adequate buffer areas where they adjoin residential land and carefully planned and controlled access to suitable highways * * *

"The Town Plan includes a policy of encouraging a limited amount of business office research, and industrial development in carefully selected locations and with high standards of design".

The town plan also enumerates recommended standards and restrictions for office and research development, covering such matters as traffic access, plot size, setbacks and parking. A comparison of these standards with those contained in the zoning amendments adopted by the Town Board reflects the Board's adherence to the guidelines enumerated in the town plan. The record lacks any evidence to indicate that the Town Board's actions were in contravention of the guidelines set forth in the town plan.

### IV. CONCLUSION

The facts in this case lead us to conclude that the Town Board, as "lead agency" under SEQRA, took a "hard look" at the relevant areas of environmental concern and reached a reasoned

judgment on IBM's rezoning application (*Aldrich v. Pattison, supra*). The extensive public debate, the scrupulous and lengthy review of the DGEIS and FGEIS submitted by IBM, as well as the numerous restrictions placed on IBM's proposed facility establish that, rather than abdicating its responsibilities under SEQRA, the Town Board acted responsibly in giving serious consideration to the impact of IBM's proposed development on the immediate area around the site and on the entire New Castle community. Moreover, the DGEIS and FGEIS submitted by IBM, and relied upon by the Town Board in reaching its determination on IBM's application, were in compliance with SEQRA. With respect to plaintiff's major challenge to the suffi-. ciency of the DGEIS and FGEIS, we emphasize once again that to require every private developer to include a thorough and lengthy analysis of alternative sites for the proposed development in its environmental impact statement would constitute an unreasonable and unnecessary burden and, as such, would contravene the rule of reason governing SEQRA's substantive requirements. Finally, the Town Board's zoning resolutions were consistent with the goals and objectives of the Town of New Castle's comprehensive zoning plan, thereby complying with the requirements of Town Law § 263.

It is axiomatic that a presumption of validity attaches to legislative determinations such as the zoning amendments enacted in this case (*Coutant v Town of Poughkeepsie*, 69 AD2d 506). This principle was acknowledged by the Court of Appeals in *Matter of Cowan v Kern* (41 NY2d 591, 599): "The crux of the matter is that the responsibility for making zoning decisions has been committed primarily to quasi-legislative, quasi-administrative boards composed of representatives from the local community. Local officials, generally, possess the familiarity with local conditions necessary to make the often sensitive planning decisions which affect the development of their community. Absent arbitrariness, it is for locally selected and locally responsible officials to determine where the public interest in zoning lies * * * Judicial review of local zoning decisions is limited; not only in our court but in all courts. *Where there is a rational basis for the local decision, that decision should be sustained.* It matters not whether, in close cases, a court would have, or should have, decided the matter differently. *The judicial responsibility is to review zoning decisions but not, absent proof of arbitrary and unreasonable action,* to make them" (emphasis supplied).

Thus, in view of the absence of any evidence to establish that the Town Board's actions in this case were arbitrary, capricious or irrational, its grant of summary judgment to the

defendants should not be disturbed (*Aldrich v Pattison, supra; Matter of Cowan v Kern, supra*). However, we note that Special Term erred in ordering dismissal of the complaint. Since this is a declaratory judgment action, Special Term should have directed the entry of a judgment declaring that the Town Board's actions with respect to the instant zoning amendments were legal, valid and in full compliance with the requirements of SEQRA and the Town Law (*see, Holliswood Care Center v Whalen,* 58 NY2d 1001, 1004; *Lanza v Wagner,* 11 NY2d 317, 334, *appeal dismissed* 371 US 74, *cert denied* 371 US 901). Accordingly, the order appealed from should be modified so as to delete the provision thereof directing dismissal of the complaint and the matter should be remitted to the Supreme Court, Westchester County, for the entry of an appropriate judgment declaring the rights of the parties in accordance herewith.

NIEHOFF, RUBIN and LAWRENCE, JJ., concur.

Order of the Supreme Court, Westchester County, dated August 31, 1984, modified by deleting therefrom the provision directing dismissal of the complaint. As so modified, order affirmed, with one bill of costs to respondents appearing separately and filing separate briefs, and matter remitted to the Supreme Court, Westchester County, for the entry of an appropriate judgment declaring the rights of the parties in accordance with the opinion herewith.