In the Matter of RESIDENTS FOR A MORE BEAUTIFUL PORT WASHINGTON, INC., et al., Appellants, v TOWN OF NORTH HEMPSTEAD et al., Respondents.

Second Department, August 28, 1989

**APPEARANCES OF COUNSEL**

*Cole & Deitz (Joseph DiBenedetto* and *Jeanne M. Murphy* of counsel), for appellants.

*Diana Prevete, Acting Town Attorney,* and *Kronish, Lieb, Weiner & Hellman (Justin N. Feldman, John Hartje, Michael C. DeLisa* and *A. Kaiper Wilson,* and *Sive, Paget & Riesel, P. C. [David Paget* and *Mark A. Chertok]* of counsel), for respondents. (One brief filed.)

MOLLEN, P. J.

The respondent Town of North Hempstead has traditionally disposed of its solid waste by means of landfilling. In 1983, the New York State Legislature imposed a statutory deadline of December 1990 on Nassau and Suffolk Counties for the phasing out of solid waste landfill operations and their replacement with alternate means of solid waste disposal (ECL 27-0704). In accordance with this mandate, the respondent Town of North Hempstead Solid Waste Management Authority (hereinafter the Authority) was created in 1984 by the New York State Legislature for the purpose of planning, developing, financing and operating a solid waste management resource facility in the town (Public Authorities Law, art 8, tit 13-F). The Authority's membership is comprised of the five members of the Town Board of the Town of North Hempstead (Public Authorities Law § 2049-c [1]).

In 1985, the Authority, which was designated the lead agency for purposes of the proposed project, commenced an extensive environmental impact analysis pursuant to the New York State Environmental Quality Review Act (ECL art 8) (hereinafter SEQRA) with regard to the proposed solid waste management facility. Over a 2½-year period, the Authority engaged in a three-phase analysis of the project. The first phase of the analysis, known as the "Project Approach and Selection Criteria Phase", was essentially definitional in nature and involved a consideration by the Authority of the problems posed by solid waste disposal, an exploration of alternative technologies and potential property sites and the development of various criteria to be used in selection of a site and the technology to be used; the first phase culminated in the issuance of a draft generic environmental impact statement (hereinafter GDEIS) on December 2, 1985. The GDEIS surveyed the geographical and climatical conditions throughout the town, which encompasses 54 square miles located on the northern shore of Long Island, and it set forth the various environmental criteria to be used in the selection of a project site. The GDEIS contained a discussion of 19 waste processing and disposal technologies, and it selected 10 technologies for more detailed investigation. The five mass-burn technologies included in that list were noted to be the most developed and widely practiced resource recovery technologies currently in use worldwide. The GDEIS indicated that the proposed facility

would be required to handle approximately 1,000 tons of solid waste per day.

After the GDEIS was issued and accepted by the Authority on December 3, 1985, copies thereof were duly distributed to the community. In compliance with the SEQRA requirements, two sessions of a public hearing were held on January 7, 1986, and written comments from the public were accepted through January 31, 1986. In March 1986, the Authority issued a final generic environmental impact statement (hereinafter the GFEIS) which included modifications of the GDEIS as well as responses to all of the public comments made with regard to the GDEIS. At that time, the Authority explained that its estimate that the proposed facility would handle approximately 1,000 tons of solid waste per day was premature since the selection of a technology and the determination of the appropriate recycling rates had not been made.

The second phase of the review, entitled the "Site and Technology Selection Phase", involved an intensive review of the various available technologies and the potential sites previously identified in the GFEIS. In May 1986 the Authority issued a "Draft Site and Technology Selection Addendum" (hereinafter the DSTSA) in which it narrowed the field of alternative solid waste disposal approaches technologies to 6 and it identified 12 potential sites within the town. Each of the 6 technologies were reviewed with respect to 35 identified criteria including public health impact, air quality, water quality, residue disposal, operational experience, safety hazards, reliability and several other identified criteria. The technologies were then rated as "[f]avorable", "[a]cceptable", "[a]cceptable with [q]ualification", "[m]arginal" or "[u]nacceptable". Although the ratings of most of the technologies under the various criteria fluctuated, the "Mass-Burn Field-Erected" technology (hereinafter the mass-burn technology) consistently received "acceptable" or "favorable" ratings.

In a subsequent technology-by-technology review, all of the options were eliminated with the exception of the mass-burn technology and the "Mechanical/Refuse Derived Fuel Processing with Dedicated Boiler technology" (hereinafter the RDF boiler technology). These two technologies were compared and were both subjected to a final screening process. In this portion of the DSTSA, it was noted that the RDF boiler technology was associated with safety hazards in the form of fires and had a higher rate of particulate emissions and emissions of dioxins and furans than did the mass-burn tech-

nology. The residue of the RDF boiler technology also contained higher amounts of organic material with the resultant effect that its rejects were more subject to decomposition and associated environmental impacts than the "bottom ash" residues associated with the mass-burn technology. The mass-burn technology also received better ratings in terms of operational experience, reliability, flexibility, construction and operation costs, design and safety. In view of those factors, the recommendation of the DSTSA was in favor of the mass-burn technology "as the most environmentally, technologically and economically feasible solid waste management for the Town's needs". The DSTSA reiterated that the proposed solid waste management program included plans for recycling.

The DSTSA next dealt with the application of criteria to the 12 sites identified by the Authority. The criteria included such considerations as the site's existing and future land use, groundwater quality, traffic access, air quality and adjacent land use. After the initial screening process, the range of potential sites was reduced to five. The additional studies performed to determine the suitability of the remaining sites included air quality modeling, estimation of dwelling units within a half-mile radius and traffic analysis. This final selection process indicated that the most desirable location for the proposed facility was a 460-acre site located on the shoreline of Hempstead Harbor, which was owned by the Morewood Realty Corporation (hereinafter the Morewood Property). This site, which borders the town's existing landfill, is currently used for sand and gravel mining and does not require roadway upgrading or rights-of-way for site access. Additionally, no dwelling units or sensitive receptors lie within a half mile radius of the site. A disadvantage of the site is the existence of the Glenwood Power Plant, which is a major source of emissions, approximately one mile east of the site. In all, however, the findings in the DSTSA were that the over-all advantages and disadvantages of the Morewood Property compared favorably with the other sites under investigation.

On June 25, 1986, public hearings were held concerning the DSTSA. Thereafter, in September 1986 the Authority issued a "Response to Public Comment and a Modification" to the DSTSA, which responded to a number of public concerns including the potential health, safety and environmental impacts of mass-burn technology. In response to a claim that mass-burn technology units have been shut down in Europe due to problems with dioxin emissions, the Authority ex-

plained that its members, as well as members of the New York State Legislative Commission on Solid Waste Management, visited Europe to investigate the matter and found "[n]o evidence of plant shutdowns due to emission problems". In fact, the Authority discovered that mass-burn technology facilities had been in successful operation in various European locations for approximately 30 years. Although certain moratoriums on new construction of these facilities were in place in order to allow research to be performed on air emissions from these facilities, a moratorium in Sweden had since been lifted.

The second phase culminated in the issuance of a "Statement of SEQRA's Lead Agency Findings" pursuant to 6 NYCRR 617.9 (b) on October 7, 1986, which proposed the selection of the 460-acre Morewood Property as the most appropriate site and mass-burn technology as the most appropriate technology for the implementation of a solid waste management facility. That document reviewed the various technologies and sites previously discussed, explained the selection criteria which were applied and provided the reasons for the Authority's ultimate site and technology selection. The document also determined that the required size of the proposed facility would be based on a contemplated 990-ton-per-day capacity.

In the third phase, known as the "Site-Specific Impact Definition Phase", the Authority evaluated the potential adverse environmental effects of implementing the proposed mass-burn facility on the Morewood Property. The Authority during this phase issued a Draft Site and Technology Specific Impact Addendum in February 1987. Therein, the Authority provided a detailed description of the structure and operation of the proposed facility, which would contain three boilers each having the capacity of handling 330 tons of solid waste per day, and explained the various environmental, health and safety measures which were to be taken to prevent adverse health, safety and environmental impacts. The DSTSA further explained that the proposed facility would be constructed on a 60-acre portion of the 460-acre site and that the remaining 400 acres would be utilized for the previously proposed recycling program. Additionally, the DSTSA indicated that the 400-acre site might be used for composting of yard waste and as a source for cover and capping material to support the operation of the town's existing landfills and solid waste management program.

Another public hearing was held on March 31, 1987, at which time public comments on the DSTSA were received. Thereafter, in June 1987 the Authority issued a "Response to Public Comment and Modifications" to the DSTSA, in which the Authority responded to all of the registered public comments which ranged from comments on the hazardous nature of the ash residue from the mass-burn incinerator, to the facility's use of groundwater resources and to the size of the proposed facility. In response to the expressed concern about the use of the remaining 400 acres for composting and as a source for landfill cover material, the Authority stated that these proposed uses were merely tentative and that a supplemental environmental impact statement would be prepared prior to implementation of those proposals.

On November 24, 1987, the Authority issued lead agency findings approving the construction of a 990-ton-per-day mass-burn facility with a 382.5-foot stack on 60 acres of the Morewood Property, with the remaining 400 acres of the parcel to be purchased "for other related solid waste management uses". The Authority certified that the project was "[c]onsistent with the social, economic and other essential considerations from among the reasonable alternatives thereto [and] the action herein approved is one which minimizes or avoids adverse environmental effects to the maximum extent practicable".

On March 15, 1988, the Town Board adopted a resolution transferring to the Authority the responsibility for operating the town's existing landfill, and granted the Authority the right to set and receive certain tipping fees for the disposal of waste at the landfill and at the proposed facility. The transfer was effectuated pursuant to a Landfill Concession and Solid Waste Service Agreement (hereinafter Landfill Agreement), executed by the Town Board and the Authority on March 15, 1988. In connection with the transfer, the town completed an environmental assessment form and a "notice of determination of non-significance", or "negative declaration". On that same date, the Authority entered into a contract of sale for the purchase of the Morewood Property for $33,200,000.

■ The petitioners instituted the instant proceeding pursuant to CPLR article 78 against the town, the Town Board and the Authority seeking to review the approval of the GFEIS and SEQRA findings and to enjoin the respondents from proceeding with further development of the proposed project. The Supreme Court dismissed the petition in its entirety,

finding that the respondents had taken the requisite "hard look" at the technological alternatives at issue and had properly reviewed all the criteria required by SEQRA. We agree and, accordingly, affirm.

It is well established that the standard of judicial review in challenges involving substantive compliance with SEQRA guidelines such as that involved here is limited to consideration of whether the agency's determination is arbitrary and capricious or unsupported by substantial evidence in the record (see, Horn v International Business Machs. Corp., 110 AD2d 87, 92-93; Aldrich v Pattison, 107 AD2d 258, 265-266). Thus, if the record establishes that the agency took a "hard look" at the relevant areas of environmental concern and made a reasoned judgment, the courts will not disturb the agency's determination (see, Horn v International Business Machs. Corp., supra, at 93; Aldrich v Pattison, supra, at 266; H.O.M.E.S. v New York State Urban Dev. Corp., 69 AD2d 222, 232).

Addressing the challenges herein, the petitioners argue, in the first instance, that the GFEIS produced by the Authority, which was comprised of the various documents issued by the Authority over the 2½-year review process, failed to include a meaningful analysis and review of alternative technologies to the mass-burn technology selected by the Authority. The relevant statutory and regulatory guidelines pertaining to the content of an environmental impact statement require that the statement include an analysis of reasonable alternatives to the proposed action (see, ECL 8-0109 [2] [d]; [4]; 6 NYCRR 617.14 [f] [5]). Clearly in the case at bar, the GFEIS produced by the Authority during the three-phase review regarding the proposed solid waste management facility contained detailed and thorough discussions of the various available technologies and the Authority's final selection of mass-burn technology was well documented. The record reflects that the Authority assessed 19 different technologies in the first phase of review and, at that time, eliminated 9 technologies from consideration. After eliminating 4 of the remaining 10 technologies in its second phase of review, the Authority subsequently applied 35 criteria to the other 6 remaining technologies. Following that review, the Authority narrowed the choices to RDF boiler technology and mass-burn technology and, after comparing the technological, safety, economic and various other characteristics of these technologies, the Authority selected mass-burn technology. Notably, mass-burn technology had the long-

est history of successful worldwide operation and its record of compliance with air quality regulations was superior to that of RDF boiler technology. Although the petitioners complain that several alternative technologies were eliminated by the Authority during the first phase of review which precluded a detailed analysis and comparison of these technologies in the subsequent review phase, we note that SEQRA does not require an exhaustive analysis of every possible alternative to the proposed action provided that the SEQRA review was "consistent with social, economic and other essential considerations" (ECL 8-0109 [1]; *see also, Horn v International Business Machs. Corp.,* 110 AD2d 87, 94, *supra)*. Herein, several technologies were eliminated during the initial review process as either too small, inadequately proven, excessively expensive, comparatively less flexible, more dangerous and/or less beneficial in terms of air emissions, water use and waste water discharges than mass-burn technology. Based on the record herein, we conclude that the elimination of these tecnologies during the preliminary review stages was neither arbitrary nor capricious and was supported by substantial evidence.

In a related argument, the petitioners also contend that the Authority failed to take a "hard look" at the environmental impacts of the proposed mass-burn facility at the Morewood Property site. This contention also lacks merit, as it is apparent from the record that the Authority evaluated in considerable detail the projected effects of the proposed facility upon coastal resources, air quality, water quality and quantity, public health, wetlands and wildlife. Although petitioners' experts disagree with premises, data, and/or methodologies utilized by the Authority's expert, we note that in its lengthy analyses of anticipated environmental and public health impacts, the Authority's conclusion is supported by accepted governmental guidelines and scientific authorities. As has been noted, the findings in an environmental impact statement "need not achieve scientific unanimity" *(Matter of Schiff v Board of Estimate,* 122 AD2d 57, 60), and since there exists a rational basis and substantial evidence in the record supporting the Authority's assessment of the impacts of the proposed facility, this court will not substitute its judgment for that of the agency's experts in the absence of a showing that a mistake has been made, and that the mistake was "of possible significance in the results" *(Aldrich v Pattison,* 107 AD2d 258, 270, *supra,* citing *Vermont Yankee Nuclear Power*

*Corp. v Natural Resources Defense Council,* 435 US 519, 553-554).

■ The petitioners also contend that the Authority improperly segmented the SEQRA review by deferring, to some unspecified future date, a detailed environmental assessment of possible plans for composting, cover-material mining and other solid waste management activities on the remaining 400 acres of the Morewood Property which would not be used for the proposed incineration and recycling facility. However, as the Supreme Court noted, the GFEIS discusses the potential environmental impacts associated with the proposed composting and mining operations planned for parts of the 400-acre balance of the Morewood Property, "including, *inter alia,* traffic effects, dust, odors, noise, groundwater quality, water supply, wastewater generation and aesthetics", and reveals that mitigation measures were also considered. In addition, the proposed composting programs and other potential plans did not represent an irreversible commitment on the part of the Authority. Indeed, at this stage the composting and sand mining proposals are merely tentative and, thus, did not necessitate more than a generalized discussion of their possible environmental impacts. Significantly, the Authority has undertaken not to proceed with unevaluated uses of the 400-acre balance of the Morewood Property without filing additional environmental impact statements in compliance with SEQRA. In determining whether an action will have a significant effect upon the environment, "the lead agency must consider reasonably related long-term, short-term and cumulative effects, including other simultaneous or subsequent actions which are: (1) included in any long-range plan of which the action under consideration is a part; (2) likely to be undertaken as a result thereof; or (3) dependent thereon" (6 NYCRR 617.11 [b]). However, an environmental impact statement is not required until a specific project is actually proposed *(Matter of Programming & Sys. v New York State Urban Dev. Corp.,* 61 NY2d 738). To the extent that no specific plan for the remaining 400 acres of the Morewood Property has been formulated, no environmental impact statement is required *(cf., Matter of Save the Pine Bush v Planning Bd.,* 70 NY2d 193).

■ The petitioners' complaint that the environmental impact statement herein violated ECL 8-0109 (2) and 6 NYCRR 617.14 (b) and (c) because it was incomprehensible was not raised before the Supreme Court and is therefore, not pre-

served for appellate review. In any event, we find the contention to be without merit, as evidenced by the considerable volume of comment and analysis submitted by the petitioners themselves throughout the SEQRA process, supporting the conclusion that the public was quite capable of understanding the GFEIS as it evolved.

Finally, the petitioners contend that the town's approval of the Landfill Agreement, whereby the town transferred to the Authority the responsibility for operating the town's present landfill, violated SEQRA because no environmental impact statement was issued regarding the transfer. According to the petitioners, the town's adoption of the resolution which approved the agreement constituted a final decision to fund the Authority's proposed purchase of the Morewood Property and to embark upon construction of the mass-burn incinerator. As such, the petitioners assert that it is subject to the requirements of 6 NYCRR 617.9 (c), which forbids a final decision to fund an action that has been the subject of a final environmental impact statement until certain written findings are made. Contrary to the petitioner's contention, however, the town's approval of the aforesaid agreement was not a decision to fund the Authority's proposed action, nor did it constitute an "approval" of the Authority's purchase of the Morewood Property. The agreement is a contract for services, not one to provide funding. Although the agreement allowed the Authority to use tipping fees to pay its debts, the agreement itself did not obligate or commit the Authority to purchase the Morewood Property.

We have reviewed the petitioners' remaining contentions and find them to be without merit. Accordingly, the order and judgment is affirmed insofar as appealed from, with costs.

MANGANO, KOOPER and SPATT, JJ., concur.

Ordered that the order and judgment is affirmed insofar as appealed from, with costs.