Matter of Binghamton Plaza, Inc. v City of Binghamton, N.Y. (2024 NY Slip Op 03116)

Matter of Binghamton Plaza, Inc. v City of Binghamton, N.Y.

2024 NY Slip Op 03116

Decided on June 6, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 6, 2024

CV-23-1060
[*1]In the Matter of Binghamton Plaza, Inc., Petitioner,
v
City of Binghamton, New York, Respondent.

Calendar Date:April 29, 2024

Before:Garry, P.J., Egan Jr., Clark, Lynch and Mackey, JJ.

Barclay Damon LLP, Buffalo (Mark R. McNamara of counsel), for petitioner.
Harris Beach PLLC, Buffalo (Allison B. Fiut of counsel), for respondent.

Mackey, J.
Proceeding initiated in this Court pursuant to EDPL 207 to review a determination of respondent condemning five parcels of petitioner's real property for the purpose of providing expanded access to a park and recreational trail in connection with a redevelopment project.
Petitioner is the owner of the Binghamton Plaza (hereinafter the Plaza), a 285,000-square-foot strip mall abutting Cheri A. Lindsey Memorial Park (hereinafter the park) located in the north side of the City of Binghamton, Broome County. By early 2023, the parking lot and buildings on the property had significantly deteriorated and storefronts were mostly vacant. On February 6, 2023, respondent publicly announced a plan to redevelop the area and sent petitioner notice of its intent to condemn five parcels of petitioner's property. After a public hearing, respondent adopted a resolution authorizing the condemnation of the Plaza parcels which, together, are 24.21 acres of property. The resolution incorporated respondent's determination and findings made pursuant to the EDPL (see EDPL 204). In it, respondent resolved to use approximately 2.25 acres of land to expand the park and 9.5 acres to connect the park to the riverside walkway to the south of the Plaza. Respondent would demolish the Plaza's existing structures and use the remaining 12.45 acres (hereinafter the building parcel) to conduct "surface subsidence restoration, sidewalk repairs and other ancillary and related amenities, facilities, and improvements." As for the State Environmental Quality Review Act (see ECL art 8 [hereinafter SEQRA]) review, respondent found that its project would not have a significant impact on the environment, so it issued a negative declaration, segmenting the impact of its redevelopment plans for a later SEQRA review. Petitioner then commenced this proceeding pursuant to EDPL 207 seeking an order vacating respondent's determination and findings and to bar the acquisition of its property by eminent domain.
Pursuant to EDPL 207, which governs judicial review of a determination to condemn property, our review "is limited to whether the proceeding was constitutional, whether the acquisition was within the condemnor's statutory authority and whether a public use, benefit or purpose will be served by the proposed acquisition" (Matter of PSC, LLC v City of Albany Indus. Dev. Agency, 200 AD3d 1282, 1284 [3d Dept 2021] [internal quotation marks, ellipsis and citations omitted], lv denied 38 NY3d 909 [2022]). Petitioner, as the party challenging the condemnation, bears the "burden of establishing that the determination was without foundation and baseless, or that it was violative of the applicable statutory criteria" (id. [internal quotation marks, ellipsis and citations omitted]).
Initially, we reject petitioner's contention that respondent's determination was not rendered in accord with statutory procedures. Petitioner claims that respondent failed to provide a copy of the public hearing record to the [*2]Broome County Clerk's office, as required by EDPL 203. It is well established that the condemnor is required to make its determination in accordance with the statutory procedures set forth in EDPL article 2 and ECL article 8, and this Court's review of a condemnor's determination includes whether such procedures were followed (see EDPL 207 [C] [3]; Matter of Johnson v Town of Caroga, 162 AD3d 1353, 1354 [3d Dept 2018]). Nevertheless, it is the party challenging the condemnation who "bear[s] the burden of establishing that the determination . . . was violative of any of the applicable statutory criteria" (Matter of Johnson v Town of Caroga, 162 AD3d at 1354 [internal quotation marks and citation omitted]; see Matter of Rafferty v Town of Colonie, 300 AD2d 719, 721 [3d Dept 2002]). Petitioner's contention that respondent failed to comply with EDPL 203 because it "failed to make [a copy of the public hearing transcript] available at the Broome County Clerk's office" is belied by the record, which shows that on March 31, 2023, respondent's attorneys submitted to the Broome County Clerk's office for filing a copy of the transcript of the EDPL article 2 public hearing, together with the hearing exhibits.
We also reject petitioner's contention that respondent's condemnation was excessive or otherwise improper because it did not outline a specific future use for the building parcel. According to petitioner, this renders the taking in excess of that which is necessary to accomplish the intended public purpose of respondent's project. "Although a condemnor cannot use eminent domain to take property not necessary to fulfill the public purpose, it is generally accepted that the condemnor has broad discretion in deciding what land is necessary to fulfill that purpose" (Matter of PSC, LLC v City of Albany Indus. Dev. Agency, 200 AD3d at 1283 [internal quotation marks and citations omitted]; see Hallock v State of New York, 32 NY2d 599, 605 [1973]). In making its determination, respondent specifically sought to condemn the building parcel to conduct "surface subsidence restoration, sidewalk repairs and other ancillary and related amenities, facilities, and improvements." It also sought to destroy the building parcel structures, which respondent's mayor noted at the public hearing were "dilapidated" and deterring residents from using the adjacent park and riverside walkway. Respondent also determined that demolishing the building parcel structures would "decreas[e] the negative impacts associated with large vacant buildings within [Binghamton] and increas[e] [Binghamton's] sales tax revenues and the property tax base." On this record, we conclude that respondent neither abused nor improvidently exercised its discretion in determining the scope of the taking (see Matter of United Ref. Co. of Pa. v Town of Amherst, 173 AD3d 1810, 1811-1812 [4th Dept 2019], lv denied 34 NY3d 913 [2020]).
Lastly, we reject petitioner's contention that respondent failed to satisfy [*3]the requirements of SEQRA. "This Court will not disturb a SEQRA determination so long as the lead agency identified the pertinent areas of environmental concern, took a hard look at them and advanced a reasoned elaboration of the grounds for its determination" (Matter of Evans v City of Saratoga Springs, 202 AD3d 1318, 1320 [3d Dept 2022] [internal quotation marks, brackets and citations omitted]; see Matter of Boise v City of Plattsburgh, 219 AD3d 1050, 1055-1056 [3d Dept 2023]; ECL 8-0109 [2] [a]-[e]). Issuing a "negative declaration" that there will be no significant environmental impact is one way to satisfy SEQRA's mandate (6 NYCRR 617.3 [c] [1]; see ECL 8-0109 [2]; 6 NYCRR 617.7 [a] [2]; Matter of Granger Group v Town of Taghkanic, 77 AD3d 1137, 1142-1143 [3d Dept 2010], lv denied 16 NY3d 781 [2011]). This Court cannot "evaluate data de novo, weigh the desirability of any particular action, choose among alternatives or otherwise substitute [its] judgment for that of the agency" when reviewing a lead agency's SEQRA determination (Matter of Save the Pine Bush, Inc. v Town of Guilderland, 205 AD3d 1120, 1123 [3d Dept 2022] [internal quotation marks and citation omitted]). Relatedly, " '[s]egment[ing]' " an action involves dividing its environmental review into various stages " 'as though they were independent, unrelated activities, needing individual determinations of significance' " (Matter of Evans v City of Saratoga Springs, 202 AD3d at 1320, quoting 6 NYCRR 617.2 [ah]). Such review is proper when not motivated by a desire to avoid comprehensive SEQRA review and when the lead agency sets forth its reasons for segmenting the action and explains why such review "is clearly no less protective of the environment" (6 NYCRR 617.3 [g] [1]; see Matter of Evans v Saratoga Springs, 202 AD3d at 1320; Matter of Saratoga Springs Preserv. Found. v Boff, 110 AD3d 1326, 1328 [3d Dept 2013]).
Here, the environmental assessment form (hereinafter EAF) indicates that respondent planned to demolish and remove existing structures and pavement. On the Plaza property is also a "waste layer" of 17 feet extending across approximately 24 acres of the land. In terms of volume, respondent noted it was about 630,825 cubic yards of material. The material to be removed is "[a]sphalt, concrete, fill (rock and clean soil), [and] solid waste from [the] former landfill on site." The EAF notes that incinerator ash from an adjacent garbage incinerator was stored on the Plaza property in the 1950s and 1960s. Respondent noted several potential impacts of the project, including (1) the excavation and removal of more than 1,000 tons of natural material, (2) construction within a state historical site, (3) the presence of an emergency spill remediation, or a completed environmental site remediation on, or adjacent to, the site of the proposed action, (4) the action might unearth solid or hazardous waste and (5) the action might disturb a nearby area used for disposing of hazardous waste[*4]. The Plaza property is also subject to an environmental easement. Relatedly, the Plaza property is part of a Department of Environmental Conservation (hereinafter DEC) Site Management Program (hereinafter SMP) to clean up environmental waste remaining on the Plaza property — namely, the ash underneath the ground. That SMP places conditions on the use of the Plaza property "to control exposure to remaining contamination during the use of the site to ensure protection of public health and the environment." For example, DEC requires that there be "three sub-slab depressurization systems" on site to monitor methane levels in crawl spaces with exterior ventilation systems in particular buildings. The SMP also requires that the ash material be covered by topsoil, asphalt or concrete, and building slabs, and mandates periodic inspections.
As respondent recognized in rendering its determination of significance, the site controls in place "will no longer be appropriate or perhaps necessary, once the structures, pavement and subsurface contaminants are removed from the site." In other words, the environmental question before us does not concern the current use but the planned site excavation/remediation. Significantly, the SMP includes "a series of Institutional Controls in the form of site restrictions." Adherence to these controls is required under the environmental easement held by DEC. Pertinent here, "[a]ll future activities on the property that will disturb remaining contaminated material must be conducted in accordance with this SMP." In particular, the SMP includes an "excavation work plan" that governs "[a]ny future intrusive work that will permeate the soil cover or cap, or encounter or disturb the remaining contamination." Such work must be conducted pursuant to a Health and Safety Plan (HASP) and Community Air Monitoring Plan (CAMP) prepared for the site in 2014. Those plans must be updated and resubmitted together with a notification to DEC "at least 15 days prior to the start of any activity that is anticipated to encounter remaining contamination" (compare Matter of Boise v City of Plattsburgh, 219 AD3d at 1057-1060). In issuing a negative declaration for this type I project, respondent determined that these institutional controls would "mitigate any potential adverse impacts" from the planned site remediation.
Respondent issued a negative declaration, finding that no significant adverse environmental impact would result from its project, and so it declined to complete an environmental impact statement. Respondent found there to be no potential adverse air quality impact from its project, nor any effect on natural waters, traffic or noise levels or agricultural activities. While the Plaza's land would be greatly impacted, it would change for the better: over 1,000 tons of ash would be taken from the ground and replaced with topsoil, which would be seeded. There would be no significant impact from removing these materials because respondent [*5]would follow state requirements. Likewise, this project would improve soil erosion and drainage issues, as there would, after the project, be clean topsoil instead of the ashy remains of the garbage incinerator's debris. Because the Plaza already had a large parking lot, vegetation and wildlife had already been disturbed and the current project would do no further harm. Respondent predicted no increase in energy consumption because of this project, as, "at this time," it did not anticipate the addition of new structures to the Plaza parcels.
Respondent also segmented the building parcel's redevelopment from its SEQRA review here. It did so because "[a]ny potential impacts of a future economic development use of [the building parcel] will be reviewed pursuant to SEQRA, the applicable zoning ordinances of [respondent] and other applicable laws and/or regulations when such future use is formulated." Respondent added that the future review "shall be no less protective of the environment" than if it were done with the present project to improve the building parcel and expand greenspaces. Respondent noted in the EAF that while "[m]ore than 1,000 tons of material are l[i]kely to be removed" from the Plaza site, "[a]ny alteration to the site will be subject to NYSDEC oversight, including, but not limited to, permits and new controls, thereby mitigating any potential impacts to human health."
Here, because respondent stated in its negative declaration that it had not yet determined redevelopment plans for the building parcel, we find it was reasonable to hold off any environmental impact consideration for that related, but independent, project (see Matter of Friends of Stanford Home v Town of Niskayuna, 50 AD3d 1289, 1291 [3d Dept 2008], lv denied 10 NY3d 716 [2008]; Matter of Long Is. Pine Barrens Socy. v Planning Bd. of Town of Brookhaven, 204 AD2d 548, 551 [2d Dept 1994], lv dismissed & denied 85 NY2d 854 [1995]; Matter of Residents for More Beautiful Port Washington v Town of N. Hempstead, 149 AD2d 266, 275 [2d Dept 1989]). That action would be no less protective of the environment, as respondent correctly noted, because future redevelopment would require permitting and be subject to the SMP (see Matter of Concerned Citizens for Envt. v Zagata, 243 AD2d 20, 23 [3d Dept 1998], lv denied 92 NY2d 808 [1998]). Moreover, the existence of the SMP and its controls demonstrates that respondent was not avoiding SEQRA review through segmentation, as any project related to the building parcel would be subject to SMP controls regardless of any negative declaration (see Matter of PSC, LLC v City of Albany Indus. Dev. Agency, 200 AD3d at 1289; compare Matter of Defreestville Area Neighborhoods Assn. v Town Bd. of Town of N. Greenbush, 299 AD2d 631, 634 [3d Dept 2002]).
As for the negative declaration, we find that respondent identified the relevant areas of environmental concern, took a hard look at them, and made a reasoned elaboration of the basis for its determination [*6]in issuing a negative declaration (see Matter of Troy Sand & Gravel Co., Inc. v Town of Sand Lake, 185 AD3d 1306, 1313 [3d Dept 2020], lv denied 36 NY3d 913 [2021]; Matter of Gabrielli v Town of New Paltz, 93 AD3d 923, 924 [3d Dept 2012], lv denied 19 NY3d 805 [2012]; Matter of Nicklin-McKay v Town of Marlborough Planning Bd., 14 AD3d 858, 861-862 [3d Dept 2005]).
Garry, P.J., Egan Jr., Clark and Lynch, JJ., concur.
ADJUDGED that the determination is confirmed, without costs, and petition dismissed.