In the Matter of KENNETH SCHULTZ et al., Individually and as Members of the Neversink River State Nature Preserve Advisory Committee, et al., Respondents, v THOMAS JORLING, as Commissioner of the New York State Department of Environmental Conservation, et al., Appellants. (And Another Related Proceeding.)

Third Department, December 6, 1990

---

APPEARANCES OF COUNSEL

*Robert Abrams,* Attorney-General *(Michael J. Moore, Peter H. Schiff* and *Douglas H. Ward* of counsel), for appellants.

*Jacob R. Billig* for Kenneth Schultz and others, respondents.

*Kenneth C. Klein* for Town of Forestburg, respondent.

### OPINION OF THE COURT

YESAWICH, JR., J.

In 1987, respondent Department of Environmental Conservation (hereinafter DEC), the lead agency for review of the development of a nature preserve located in Sullivan County and referred to as the Neversink River Unique Area, published a positive declaration of environmental significance *(see,* 6 NYCRR 617.2 [cc]).[1] A draft environmental impact statement (hereinafter EIS) was thereupon prepared. This draft EIS addressed the likely environmental impacts of acquiring several thousand acres of land, as well as hunting, fishing and trapping rights of a private party, within the Neversink River area. It also considered the effects of thereafter implementing site-specific land unit management plans (hereinafter UMPs) to protect and preserve the wilderness character of the acquired lands, the plants, the fish and the wildlife therein, and to manage and control public use and enjoyment of this unique area.

In the course of a joint EDPL and State Environmental Quality Review Act (ECL art 8) (hereinafter SEQRA) public hearing on the proposed project, concern was expressed that

---

1. This court has previously addressed several related issues regarding the Neversink River Unique Area *(Matter of Wechsler v New York State Dept. of Envtl. Conservation,* 153 AD2d 300, *affd* 76 NY2d 923; *Wechsler v People,* 147 AD2d 755, *lv denied* 74 NY2d 610, *appeal dismissed* 75 NY2d 808).

the draft EIS improperly segmented SEQRA review in that the potential environmental impacts of the management phase of the project were being postponed to some unstated future time rather than being considered with the acquisition impacts. DEC responded to this charge in the staff comment section of the final EIS, published in March 1989; DEC asserted that it could not develop site-specific management plans before knowing the final configuration of the acquired land parcels.

■ Thereafter, petitioners, members of the Neversink River Nature Preserve Advisory Committee and the Town of Forestburg, disenchanted with what DEC had achieved, initiated the first of these proceedings (hereinafter *Schultz I)* to prevent DEC from securing any land until such time as it prepared a proper, lawful and complete EIS. While *Schultz I* was pending, DEC issued a negative declaration *(see,* 6 NYCRR 617.2 [y]) for the acquisition of an additional 2,094 acres of land known as the Philwold Estates, even though the final EIS had identified only 875 acres of this land as being within the contemplated preserve. Thereafter, petitioners in *Schultz I* commenced a second CPLR article 78 proceeding (hereinafter *Schultz II)* to annul the negative declaration upon the same segmentation theory advanced in *Schultz I.* After the two proceedings were consolidated, Supreme Court determined that DEC improperly segmented review of the project and, accordingly, granted both petitions. DEC urges on appeal that it has complied both procedurally and substantively with SEQRA; we agree.

Segmentation, which is dividing the environmental review of an action in such a manner that the various stages are addressed as though they were independent, unrelated activities, needing individual determinations of significance (6 NYCRR 617.2 [gg]), is contrary to the intent of SEQRA (6 NYCRR 617.3 [k] [1]). The prohibition against segmentation guards against two related evils: the first occurs when a project which would have a significant effect on the environment is split into two or more smaller projects, with the result that each falls below the threshold requiring review *(see, e.g., Matter of Sutton v Board of Trustees,* 122 AD2d 506, 508-509); the second, and petitioners' concern herein, occurs when a project developer wrongly excludes certain activities from the definition of his project for the purpose of keeping to a minimum its environmentally harmful consequence, thereby making it more palatable to the reviewing agency and commu-

nity (Gerrard, Ruzow and Weinberg, Environmental Impact Review in New York § 5.02 [1]). Because, as these situations evince, it would be possible that the activities comprising the entire project were not subjected to review, segmentation is disfavored.

The regulations, however, while generally discouraging segmented review, set forth procedures which permit it under limited circumstances (see, e.g., 6 NYCRR 617.15, 617.3 [k] [1]). Distinguishing between permissible segmentation, which may be necessitated by the exigencies of a project's review, and impermissible segmentation, which distorts the approval process, can be difficult (Gerrard, Ruzow and Weinberg, Environmental Impact Review in New York § 5.02 [1]). Permissible segmentation requires related actions be identified and discussed "to the fullest extent possible" (6 NYCRR 617.3 [k] [1]). Where, however, a circumstance arises when a phase or activity of a project is not a current undertaking but one that will be carried out, if at all, in the future, detailed analysis is often impossible (Gerrard, Ruzow and Weinberg, Environmental Impact Review in New York § 5.02 [2]). In such an instance, the problem of ensuring appropriate review may be redressed with a generic EIS (see, 6 NYCRR 617.15 [a]).

Petitioners postulate that because acquisition and management of the acquired land may be classified as separate parts of an action, as opposed to separate actions, review by way of a generic EIS is impermissible.[2] Supreme Court adopted this view. We do not interpret the regulations so narrowly. Generic EISs, which broadly analyze the environmental effects of one large, extended action or smaller, separate related actions (6 NYCRR 617.15 [a] [1]-[4]), provide a method for reviewing complex projects, including resource management plans, such as the one involved here (Gerrard, Ruzow and Weinberg, Environmental Impact Review in New York § 5.03 [1]).

The logical and ineluctable extension of petitioners' segmentation claim would require DEC to prepare UMPs before actually acquiring the land. The record discloses the infeasibility of this proposal. The UMP process is a lengthy and often complicated one. A management plan includes site-specific

---

2. Relevantly, the regulations in fact do not artificially distinguish between action and actions as petitioners urge because actions are subsumed within the definition of an action. The regulation provides: "Actions commonly consist of a set of activities or steps * * * [which] shall be considered the action, whether the agency decisionmaking relates to the action as a whole or to only a part of it" (6 NYCRR 617.3 [k]).

descriptions of the topography, fauna and flora of a geographic area, as well as goals and objectives for preserving and managing the acreage. Field visits are said to be essential to the proper preparation of such site-specific narrative and graphic summaries. DEC satisfactorily demonstrates that it would be impractical to expect it to furnish a comprehensive management plan until it can readily access the land. Moreover, requiring UMPs in advance would, in some situations, waste valuable resources spent compiling the comprehensive data if, for example, the land for which a UMP had been fashioned was never acquired. Because land acquisition and management may be best considered as sequential steps for developing a nature preserve, evolving a site-specific UMP after the land has been obtained is the more feasible, practical and economical course to follow.

■ Significantly, in the case at hand, DEC included many of the UMP's management objectives (for example, enforcement of prohibitions against fires, camping, littering, horses, swimming, snowmobiling and other purported adverse consequences occasioned by public use of the unique area) in the draft EIS, which was incorporated into the final EIS. Further, DEC specifically noted that the draft EIS "is comparable to a generic environmental impact statement for [UMP review]", because the proposed measures and techniques for mitigating the potential detriment to the unique area resulting from public use are discussed generically and not in a site-specific way. And consistent with 6 NYCRR 617.15 (b), the draft EIS and the final EIS assure that any UMPs ultimately devised for the unique area "would be subject to SEQR[A] review prior to adoption * * * [and] developed with full participation of the public". Inasmuch as DEC evaluated the expected uncongenial environmental impacts of the current and future phases of the development of the Neversink River Unique Area and recommended techniques designed to curtail them, it acted in accordance with lawful procedure (see, Matter of Residents for a More Beautiful Port Wash. v Town of N. Hempstead, 149 AD2d 266, 275; cf., Matter of Cahn v Planning Bd., 157 AD2d 252, 257).

■ Moreover, we are unable to agree with Supreme Court's determination in Schultz II that DEC's negative declaration regarding the Philwold Estates' acquisition similarly unlawfully segmented review of the unique area project. The final EIS originally identified and discussed the environmental effects of procuring 875 acres of the Philwold Estates and

indicated that "other lands in addition to these parcels [might] be considered for possible acquisition in the future". All that this addition triggers is the postfinal EIS modification review process, namely, the need for a supplemental EIS once the agency determines, after "hard look" analysis, that any ensuing harmful environmental impacts are sufficiently profound *(see, Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 429-430; *see also, Lazard Realty v New York State Urban Dev. Corp.,* 142 Misc 2d 463, 472; 6 NYCRR 617.8 [g] [1] [i]). Review of the record establishes that DEC took the requisite, if not fulsome, "hard look" at relevant areas of environmental concern occasioned by this further addition of Philwold Estates, and made a "reasoned elaboration" of the basis for its negative declaration *(see, Chinese Staff & Workers Assn. v City of New York,* 68 NY2d 359, 363-364; *Matter of Stewart Park & Reserve Coalition v New York State Dept. of Transp.,* 157 AD2d 1, 6-7, *lv granted* 76 NY2d 711). The negative declaration specifically incorporates by reference an 11-page full environmental assessment form, a form specifically designed to help agencies determine whether an action is significant. Only after concluding that the increased acreage would not have a significant environmental effect on the Neversink River Unique Area, that the additional lands will enhance the area esthetically, that the wilderness character of the land will be extended and that the unavoidable, untoward adverse consequences associated with human activity on these lands could be greatly minimized with the mitigation measures outlined in the final EIS, did DEC lawfully issue a negative declaration *(see, Matter of Jackson v New York State Urban Dev. Corp., supra,* at 430).

█ Finally, we disagree with petitioners' contention, not reached by Supreme Court, that DEC's determinations were arbitrary, capricious and unsupported by substantial evidence. Essentially, petitioners question the accuracy and comprehensiveness of the draft and final EISs. " 'Not every conceivable environmental impact, mitigating measure or alternative must be identified and addressed before a [final] EIS will satisfy the substantive requirements of SEQRA' " *(Matter of Jackson v New York State Urban Dev. Corp., supra,* at 417, quoting *Aldrich v Pattison,* 107 AD2d 258, 266). Remembering that the reviewing court's role is to ensure that the determination was supported by substantial evidence *(see, Matter of Orange Envt. v Jorling,* 161 AD2d 1069, 1070), we are of the view that the EISs are substantively sufficient, for they ade-

quately considered and analyzed the relevant environmental impacts and comprehensively included mitigating steps and project alternatives.

MAHONEY, P. J., CASEY, MIKOLL and HARVEY, JJ., concur.

Judgment reversed, on the law, without costs, determinations confirmed and petitions dismissed.