[625 NYS2d 371]

Sun Company, Inc. (R & M), et al., Petitioners, v City of Syracuse Industrial Development Agency, Respondent.

Mobil Oil Corporation, Petitioner, v City of Syracuse Industrial Development Agency, Respondent.

Upstate Milk Cooperatives, Inc., Petitioner, v City of Syracuse Industrial Development Agency, Respondent.

Fourth Department, March 17, 1995

## APPEARANCES OF COUNSEL

*Hancock & Estabrook,* Syracuse *(William Allen, Jr.,* of counsel), for Sun Company and others, petitioners.

*Nixon, Hargrave, Devans & Doyle,* Rochester *(William D. Eggers* and *Kevin Recchia* of counsel), for Mobil Oil Corporation, petitioner.

*Harter, Secrest & Emery,* Syracuse *(James P. Burns, III,* of counsel), for Upstate Milk Cooperatives, Inc., petitioner.

*Hiscock & Barclay,* Buffalo *(Mark R. McNamara* of counsel), for respondent.

## OPINION OF THE COURT

BOEHM, J.

Petitioners, Sun Company, Inc. (Sun), Atlantic Refining & Marketing Company, Inc. (Atlantic), Citgo Petroleum Corporation (Citgo), and Mobil Oil Corporation (Mobil) (collectively, the Oil Companies) and Upstate Milk Cooperatives, Inc. (Upstate) challenge, pursuant to EDPL 207, the findings and determination of respondent, City of Syracuse Industrial Development Agency (SIDA), to condemn property owned by petitioners situated near the south shore of Onondaga Lake in the Oil City area of the City of Syracuse. The purpose of the taking is the proposed development of a retail shopping center to be known as Carousel Landing (Carousel Landing Project). SIDA's determination was made after entering into a Preferred Developer Agreement with Pyramid Companies (Pyramid), a partnership engaged in the development of retail commercial properties. Petitioners contend that the proposed taking of their property is not primarily for a public purpose and that, under the terms of the Preferred Developer Agreement, SIDA illegally "contracted away" its eminent domain power. Petitioners also attack the validity of the condemnation in various other respects. Petitioners contend, *inter alia,* that the environmental review of the Carousel Landing Project, made under ECL article 8, the State Environmental Quality Review Act (SEQRA), was improperly segmented from other planned development at the Syracuse lakefront and that the environmental review was deficient.

I

## The History of the Carousel Landing Project

The proposed condemnation of petitioners' properties is the latest in a series of actions dating back to 1987, when SIDA

and the City announced a Master Plan for redevelopment of approximately 800 acres of land known as the "Lakefront Area", bounded by Onondaga Lake to the north and by interstate highways on the east, south and west. At that time, in addition to development of a proposed retail shopping mall to be known as "Carousel Center", the Master Plan contemplated the creation of a lakefront park, a light industrial trade zone, cluster multifamily housing, a marina and office park, and mixed commercial and retail uses. In 1990, Pyramid completed construction of Carousel Center, financed with SIDA-issued bonds, in the northern portion of the Lakefront Area. With several other entities, Pyramid also constructed projects in the Franklin Square area, which is located at the southern end of the Lakefront Area.

In March 1988, after SIDA accepted the Final Environmental Impact Statement for Carousel Center, Mobil challenged the SIDA determination. Among the grounds raised by Mobil were the improper segmentation of SIDA's environmental review of the project, the failure to consider the secondary and cumulative effects of future development in Oil City, the adverse effect on the downtown business district, and the cost of relocating Mobil's oil tanks. We dismissed the petition on the ground that Mobil lacked standing (see, Mobil Oil Corp. v Syracuse Indus. Dev. Agency, 152 AD2d 988, affd 76 NY2d 428).

In May 1990, pursuant to the redevelopment plan for the Syracuse lakefront, which was termed the "Inner Harbor Project", SIDA passed a resolution declaring its intent to act as lead agency for the purpose of undertaking the environmental review of the condemnation and redevelopment of 125 acres of land. In September 1990, having determined that the Inner Harbor Project could have a significant impact on the environment, SIDA authorized the preparation of a Generic Environmental Impact Statement (GEIS), and scheduled a public hearing regarding the scope of the issues that the Draft Generic Environmental Impact Statement (DGEIS) should address. The record indicates that public hearings were held, but does not indicate that the DGEIS was completed or that any further action on it was taken.

In December 1991 the Syracuse Office of Lakefront Development issued an "Action Plan for the Syracuse Lakefront" (Lakefront Plan). The Lakefront Plan was announced as having been prepared for the "citizens of Syracuse" by the Mayor's Lakefront Advisory Committee, comprised of an 11-mem-

ber Inner Harbor Task Force and a 23-member Strategic Planning Team.

On September 18, 1992, SIDA and Pyramid entered into a "Preferred Developer Agreement", which designated Pyramid as a preferred developer for the Carousel Landing Project to be constructed on property owned by petitioners. The Carousel Landing Project was to be "no less than a 350,000 square foot retail complex." Under the terms of the Preferred Developer Agreement, Pyramid undertook certain financial obligations and, in return, SIDA agreed to acquire "at least those properties within [Oil City] which [Pyramid] commits to acquire from [SIDA] for the development of the [Carousel Landing Project]." Pyramid agreed to pay all costs associated with the acquisition of approximately 65 acres of property and the SEQRA review. In March 1993 consultants hired by Pyramid commenced preparation of a Draft Environmental Impact Statement (DEIS) for the Carousel Landing Project.

In July 1993 representatives of the Oil Companies met with City Officials, including Susan Hopkins, the City's Director of Lakefront Development, to propose alternatives to the Carousel Landing Project. The Oil Companies presented a plan whereby the petroleum facilities would be consolidated on 33 acres of land within Oil City. The Oil Companies' consolidation plan was rejected in a letter from Ms. Hopkins, dated August 3, 1993, in which she stated: "[W]e are bound by a preferred develope[r] agreement with [Pyramid] the terms of which preclude the adoption of the [Oil Companies'] proposal."

On August 19, 1993, SIDA signed an Environmental Assessment Form for the Carousel Landing Project and, by resolution that same day, declared its intent to act as lead agency for the project. Thereafter, in September 1993, SIDA accepted the DEIS prepared by Pyramid's consultants and the public comment period under SEQRA commenced. The Final Environmental Impact Statement (FEIS) for the Carousel Landing Project was filed by SIDA and, on December 21, 1993, SIDA issued its Findings and Determination to acquire petitioners' Oil City properties for the Carousel Landing Project.

II

The Proceedings Commenced in This Court

In a prior proceeding, Supreme Court denied the motion of the Oil Companies for a preliminary injunction, dismissed

their complaint as premature, and granted SIDA's motion for a preliminary injunction enjoining the Oil Companies from restraining SIDA's agents from entering upon petitioners' property for inspection purposes. We affirmed *(see, Sun Co. v City of Syracuse Indus. Dev. Agency,* 197 AD2d 912).

As noted, the proceedings now before us were commenced by petitioners pursuant to EDPL 207. They seek annulment of SIDA's determination to condemn their properties and further challenge the adequacy of the environmental review undertaken by SIDA. The SEQRA issues are before us in the first instance, pursuant to EDPL 207 (C) (3).

SIDA's authority to acquire property is derived from General Municipal Law § 858 (4), which provides that a public benefit corporation established as an industrial development corporation (IDA) under article 18-A of the General Municipal Law may "acquire by purchase, grant, lease, gift, pursuant to the provisions of the eminent domain procedure law * * * real property or rights or easements therein necessary for its corporate purposes".

The scope of review of a proposed condemnation is limited by EDPL 207 " 'to whether the proceeding was constitutional or within the agency's statutory jurisdiction; whether the agency made its determination and findings in accordance with the procedures set forth in article 2; and whether "a public use, benefit or purpose will be served by the proposed acquisition" ' [citations omitted]. If an adequate basis for a determination is shown 'and the objector cannot show that the determination was "without foundation", the agency's determination should be confirmed' [citations omitted]" *(Matter of Waldo's, Inc. v Village of Johnson City,* 74 NY2d 718, 720-721).

### III

### Petitioners' Challenges Under EDPL 207

■ Petitioners contend that the statutory condemnation scheme granting an IDA the power to condemn property is facially unconstitutional; that, as applied, the statutory procedure is subject to an agreement with a private commercial entity and is, therefore, unconstitutional; that they have been deprived of due process because Pyramid cannot provide them with a certain and adequate source and manner of payment of just compensation; that the proposed condemnation is not

primarily for a public purpose; that SIDA illegally contracted away its eminent domain power; and that the condemnation would violate General Municipal Law § 862. Additionally, Upstate contends that the condemnation of its property is excess to the Carousel Landing Project.

Preliminarily, we reject the contention of petitioners that the statutory condemnation scheme granting an IDA the power to condemn property is facially unconstitutional. It is well established that an IDA is "authorized by statute to exercise the State's eminent domain powers" *(Matter of Northeast Parent & Child Socy. v City of Schenectady Indus. Dev. Agency,* 114 AD2d 741, 742; *see,* General Municipal Law § 858 [4]). So long as the governmental agency takes the property for a public purpose and provides the owner with just compensation, "[t]he EDPL does not violate substantive due process" *(First Broadcasting Corp. v City of Syracuse,* 78 AD2d 490, 495; *see, Rosenthal & Rosenthal v New York State Urban Dev. Corp.,* 771 F2d 44, *cert denied* 475 US 1018).

Further, the Preferred Developer Agreement provides petitioners with a certain and adequate source and manner of payment. The Agreement provides: "Prior to the actual date of taking, pursuant to EDPL Section 402 (B) 5, [Pyramid] will initially pay to the [SIDA] the total amount of acquisition damages as determined by the appraisers for those parcels which [Pyramid] commits to acquire from [SIDA]. [SIDA] will, in turn, pay said funds to the affected condemnees as their respective advance payments pursuant to EDPL Section 304 * * * [Pyramid] agrees to pay to [SIDA] those amounts determined by the Court to be full compensation including statutory interest, for those parcels which [Pyramid] commits to acquire from [SIDA]."

There is no prohibition against private funding of a public condemnation *(Matter of Waldo's, Inc. v Village of Johnson City,* 74 NY2d 718, 721, *supra; Matter of New York State Urban Dev. Corp. [TOH Realty Corp.],* 165 AD2d 733, 734-735, *lv denied* 77 NY2d 810). The provision of the Agreement regarding payment is in accord with statutory procedure *(see,* EDPL 304) and constitutes a certain and adequate source and manner of just compensation *(see, Matter of New York State Urban Dev. Corp. [TOH Realty Corp.], supra).*

### General Municipal Law Prohibition

In response to petitioners' objections based upon the

General Municipal Law, SIDA argues that the 1993 amendments to General Municipal Law § 862 (L 1993, ch 356, § 15) prohibiting IDAs from funding retail projects do not apply because (1) the amendments provide that they shall not apply to projects for which an agency has authorized assistance by the passage of an inducement resolution before the effective date of October 19, 1993, and (2) the amendments exempt tourist destinations and retail establishments in "highly distressed areas".

Although the Preferred Developer Agreement is not the equivalent of an inducement resolution, as SIDA argues, nevertheless, the Carousel Landing Project is exempt from the retail establishment prohibition. That exemption arises out of the fact that "the project is located in a highly distressed area" (General Municipal Law § 862 [2] [b] [iii]).

General Municipal Law § 854 (18) defines a "highly distressed area" as:

"(a) a census tract or tracts or block numbering areas *[sic]* or areas or such census tract or block numbering area contiguous thereto which, according to the most recent census data available, has:

"(i) a poverty rate of at least twenty percent for the year to which the data relates or at least twenty percent of households receiving public assistance; and

"(ii) an unemployment rate of at least 1.25 times the statewide unemployment rate for the year to which the data relates".

In an affidavit, William Bush, Director of the Office of Development for the City of Syracuse, states that the census tract where the project is located: "is contiguous to four (4) census tracts which qualify as 'highly distressed areas' as defined in [General Municipal Law] § 854 (18). Each of these four census tracts qualifies as a highly distressed area in that each has a poverty rate of at least 20% for the years to which the data relates or at least 20% of households receiving public assistance and an unemployment rate of at least 1.25 times the statewide unemployment rate for the year to which the data relates. These Census tracts are Census Tracts 5, 13, 22 and 23." A census map is attached to the affidavit. Petitioners do not dispute the accuracy of the location of the census tracts as affecting the property subject to condemnation or that the property is "highly distressed". Accordingly, the exception in General Municipal Law § 862 (2) (b) applies.

## Public Purpose

█ Petitioners further contend that the Carousel Landing Project is nothing more than an ordinary strip shopping center and that there is no unique characteristic of the project that can support the acquisition and forced relocation of petitioners' longstanding and important economic enterprises that provide necessary energy resources for the nonpublic purpose of developing a discount shopping mall. We reject that contention. The Carousel Landing Project is an integral part of an over-all plan to redevelop a unique public asset— the Syracuse lakefront. According to SIDA, acquisition of the Carousel Landing Project site is crucial to that redevelopment plan, which would transform an economically underutilized area limited in development potential by the presence of Oil City and its unsightly oil tanks into an aesthetic asset with a mix of residential, recreational and commercial uses. SIDA determined that acquisition of the Carousel Landing Project site would serve the public purposes of reducing physical blight and improving the aesthetic appearance of the area, improving the infrastructure in the project area, expanding employment opportunities, increasing the tax base and sales tax revenues, and promoting the identification and alleviation of environmental problems in the area. The record supports SIDA's determination that the dominant purposes of the project are to reduce urban physical and economic blight and promote economic revitalization of the acquisition site. Although Pyramid also will benefit privately from the project, that "incidental private benefit will not invalidate an agency's determination so long as the public purpose is dominant [citations omitted]" *(Matter of Waldo's, Inc. v Village of Johnson City,* 74 NY2d 718, 721, *supra; see also, Rosenthal & Rosenthal v New York State Urban Dev. Corp.,* 771 F2d 44, 46, *supra).*

We conclude, therefore, that SIDA's stated purposes for the acquisition of petitioners' property support the determination that the Carousel Landing Project serves a legitimate public purpose *(see, Matter of Waldo's, Inc. v Village of Johnson City, supra; Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 424-425; *Matter of Northeast Parent & Child Socy. v City of Schenectady Indus. Dev. Agency,* 114 AD2d 741, *supra; Rosenthal & Rosenthal v New York State Urban Dev. Corp., supra).*

## Taking Excess to Project

██ We do not reach the issue whether the proposed taking of Upstate's property is excess to the Carousel Landing Project *(see, Hallock v State of New York,* 32 NY2d 599, 605). Upstate failed to raise the issue during the EDPL proceedings, and it may not raise it now *(see, Matter of Jackson v New York State Urban Dev. Corp., supra,* at 427 ["permitting a party to raise a new issue after issuance of the FEIS or approval of the action has the potential for turning cooperation into ambush"]; *Matter of Schodack Concerned Citizens v Town Bd.,* 148 AD2d 130, 135, *lv denied* 75 NY2d 701; *Sandpiper Constr. Co. v Siegel,* 97 AD2d 539, *lv denied* 61 NY2d 608).

Upstate also contends that the condemnation is invalid because it "is directly contrary to the legislative intent underlying the Legislature's adoption of chapter 356 of the Laws of 1993, which amended the Industrial Development Agency Act to prohibit the use of industrial development funds to cannibalize one area of the State at the expense of another". The location of the project at the Lakefront Area, rather than in downtown Syracuse or elsewhere, obviously creates competition with other existing retail establishments, but it does not cannibalize; it does not induce a business establishment to relocate from one place to another. Further, the location of the project is expressly countenanced by General Municipal Law § 862 (2) (b), because it is in a "highly distressed area".

## Effect of Agreement on SIDA's Eminent Domain Power

██ There is no merit to the contention of petitioners that, in contracting with Pyramid, SIDA improperly delegated and surrendered its authority to exercise its eminent domain power. Although the Preferred Developer Agreement reflects a cooperative effort between SIDA and Pyramid, it does not surrender the eminent domain power. Pyramid may influence SIDA's decision with respect to what properties will be condemned, but the Preferred Developer Agreement clearly establishes that the condemnation decision is SIDA's and SIDA's alone *(see, e.g.,* ¶ 8). Indeed, the Preferred Developer Agreement provides that other buyers/developers may become involved should Pyramid decline to make use of all property condemned by SIDA. SIDA had control over "the ultimate decision" on the Carousel Landing Project, and thus Pyramid did not acquire SIDA's power of eminent domain.

It is undisputed that the entire area known as Oil City had been targeted for redevelopment as early as 1987, and that the approach to redevelopment was to encourage private development projects. As noted, different projects have already been undertaken in the redevelopment area, including Franklin Square (office buildings and residential units) and Carousel Center. Also under development is the New York State Barge Canal Terminal, a major tourist attraction. The plan to develop the Lakefront Area was accepted in 1991, and the Carousel Landing Project is the type of development that will provide significant public benefit.

There is also no dispute that Pyramid was the only private developer to express interest in the Carousel Landing Project. The steps articulated in the Preferred Developer Agreement were put forth to ensure that SIDA would not condemn petitioners' property unless it had a firm commitment to the project from Pyramid, i.e., to ensure that SIDA would not condemn property without adequate compensatory resources.

After identifying the goals of the parties, the Preferred Developer Agreement provides that SIDA will designate Pyramid as the preferred developer of the Redevelopment Area, and that Pyramid will diligently pursue development of the project known as Carousel Landing. The Preferred Developer Agreement states: "[SIDA] will pursue the acquisition of all properties within the Redevelopment Area pursuant to the Eminent Domain Procedure Law ('EDPL') and the State Environmental Quality Review Act ('SEQRA'), subject to the terms of this Agreement, *up to but not including, the making of the formal Determination and Findings pursuant to EDPL § 204.* In the event [Pyramid] elects not to proceed with the project or to acquire only selected parcels * * * [SIDA] has the right to continue with the acquisition of the Redevelopment Area" (emphasis added).

After discussing Pyramid's financial obligation and ability to opt out in part or in whole, the Preferred Developer Agreement's paragraph 8 states: "[Pyramid] will elect whether to proceed with the Project within 20 days after receipt of the final appraisals and, *in no event, later than 5 days before [SIDA]'s meeting at which it intends to make its Determination and Findings pursuant to EDPL § 204* * * * In the event [Pyramid] elects to proceed [SIDA] will take all the necessary actions pursuant to EDPL to acquire at least those properties within the Redevelopment Area which [Pyramid] commits to

acquire from [SIDA] for the development of this Project" (emphasis added).

In the context of this urban redevelopment project, SIDA and Pyramid did not engage in a *quid pro quo* whereby SIDA contracted away its power of eminent domain for value given by Pyramid. Here, SIDA intended to condemn the property and entered into an agreement with Pyramid to ensure that the property would be developed in the anticipated beneficial manner. The language of paragraph 8 of the Preferred Developer Agreement, suggesting that SIDA will condemn the properties upon Pyramid's final commitment to the redevelopment project, does not amount to an impermissible bargaining away of the governmental entity's power of eminent domain *(see, Matter of Waldo's, Inc. v Village of Johnson City, supra,* at 722).

## IV

### The SEQRA Review

■ Petitioners contend that SIDA failed to comply with SEQRA by, *inter alia,* (1) improperly segmenting the environmental review of the Carousel Landing Project from other lakefront projects; (2) failing to consider the environmental impacts of relocating the Oil Companies' terminal facilities; (3) failing to consider reasonable alternatives to the Carousel Landing Project; (4) failing to consider the economic impacts of the Carousel Landing Project; and (5) failing to make adequate findings concerning traffic and air quality impacts of the Carousel Landing Project.

### Segmentation of the Environmental Review
### of Carousel Landing from other Lakefront Projects

Petitioners contend that SIDA improperly segmented the environmental review of the Carousel Landing Project from other lakefront projects and failed to consider the cumulative effects of such projects.

A lead agency must consider the cumulative effect of other simultaneous or subsequent actions that are included in any long-range plan of which the action under consideration is a part. ECL 8-0109 (2) requires that all potential environmental impacts of a project subject to an environmental review be considered, including the long-term and short-term effects of

the project. Specifically, 6 NYCRR 617.3 (k) (1) provides: "Considering only a part or segment of an action is contrary to the intent of SEQR. If a lead agency believes that circumstances warrant a segmented review, it must clearly state in its determination of significance and any subsequent EIS the supporting reasons and must demonstrate that such review is clearly no less protective of the environment. Related actions should be identified and discussed to the fullest extent possible."

Segmentation is defined as "the division of the environmental review of an action such that various activities or stages are addressed under this Part as though they were independent, unrelated activities, needing individual determinations of significance" (6 NYCRR 617.2 [gg]).

Those statutory and regulatory provisions require that reasonably related long-term, short-term and cumulative effects, including other simultaneous or subsequent actions included in any long-range plan that are likely to be undertaken as a result thereof, be considered (*Matter of Long Is. Pine Barrens Socy. v Planning Bd.*, 80 NY2d 500, 512-513; *Matter of Village of Westbury v Department of Transp.*, 75 NY2d 62, 68-71; *Matter of Save the Pine Bush v City of Albany*, 70 NY2d 193, 205-207; *Onondaga Landfill Sys. v Flacke*, 81 AD2d 1022, 1023).

The proposed Carousel Landing Project site is part of the Lakefront Area contemplated for redevelopment since 1987. In 1990 SIDA, in two resolutions, declared its intent to acquire and redevelop approximately 125 acres of the Lakefront Area, entitled the "Inner Harbor". The Carousel Landing Project site is within the 85-acre "Inner Harbor East" section of that area. In the second resolution, SIDA directed that a GEIS be prepared and that a final scoping session be conducted to identify relevant areas for environmental review. A preliminary outline for a DGEIS was prepared and SIDA conducted the public scoping hearing on October 10, 1990 and issued a "Responsiveness Summary" to the comments made at the hearing. Although there is no evidence that the DGEIS was ever prepared, it does not appear that the SIDA plan to redevelop the 125 acres (an area larger than the 55.7 acres slated for the Carousel Landing Project) was ever abandoned. Rather, on December 18, 1991, then Syracuse Mayor Thomas Young issued a Lakefront Action Plan prepared by his Lakefront Advisory Committee that, in his words, "consists of more than pretty pictures and grand schemes. It is a substantive

working document that serves as a blueprint for Syracuse's next great neighborhood."

One of the four development areas specified in the Action Plan is the "Solar Street Corridor", which contains the proposed site of the Carousel Landing Project. The DEIS acknowledges that the Carousel Landing Project site is included within the larger Lakefront Area and that Carousel Landing Project will advance the plans for that area.

The over-all plans for development of the Lakefront Area were discussed by SIDA at a public hearing on September 30, 1993. Lakefront Office of Development Director Susan Hopkins, who made the presentation on behalf of SIDA, stated that the Carousel Landing Project area "has long been considered a major integral component with the redevelopment of the Syracuse Lakefront and Syracuse Inner Harbor Areas."

Although SIDA contends that it was proper to limit its DEIS and other aspects of the environmental review to the Carousel Landing Project as the only remaining viable proposal because of financial constraints and lack of developer interest, its site-specific SEQRA review resulted in improper segmentation. Such a narrow review improperly separated the impact of one phase from the impact of other phases included in the long-range plan, as if they were "independent, unrelated activities, needing individual determinations of significance" (6 NYCRR 617.2 [gg]; *see, Matter of Schultz v Jorling,* 164 AD2d 252, 255-256, *lv denied* 77 NY2d 810). The plan for developing the entire Lakefront Area and the planned recreational, residential, commercial and retail uses within the Lakefront Area are clearly "reasonably related" to the Carousel Landing Project.

Finally, although a lead agency may choose "in its discretion, not to examine the cumulative impact of separate applications within the same geographic area" *(Matter of Save the Pine Bush v City of Albany, supra,* at 205; *see, Matter of Long Is. Pine Barrens Socy. v Planning Bd., supra,* at 513; *Matter of Ecumenical Task Force v Love Canal Area Revitalization Agency,* 179 AD2d 261, 268, *lv denied* 80 NY2d 758), the decisive factor here "is the existence of a 'larger plan' for development" *(Matter of North Fork Envtl. Council v Janoski,* 196 AD2d 590, 591). In preparing the site-specific FEIS for the Carousel Landing Project, SIDA impermissibly failed to review the cumulative effect of all phases of the redevelopment planned for the Lakefront Area *(see, Matter of Save the Pine*

*Bush v City of Albany, supra,* at 205-207; *Matter of Segal v Town of Thompson,* 182 AD2d 1043, 1046-1047; *Matter of Schultz v Jorling, supra; Matter of Stewart Park & Reserve Coalition v New York State Dept. of Transp.,* 157 AD2d 1, 10, *affd* 77 NY2d 970).

## Relocation of the Oil Companies' Terminals and Pipeline Facilities

The environmental impacts associated with the relocation of petroleum supply pipelines and construction of new terminal facilities constitute a primary impact of the project and should have been considered by SIDA in its environmental review *(see,* 6 NYCRR 617.14 [c]). Mobil and the Department of Environmental Conservation commented upon the DEIS's deficiency in failing to account for the environmental impacts associated with relocation of the terminal and pipeline facilities. SIDA, however, gave no consideration to those concerns in its FEIS response. It merely commented that "[w]hether the terminal facilities will be relocated or new terminal facilities will be constructed is speculative at this time" and that "neither relocation of the terminal facilities nor construction of new terminal facilities [is an] actio[n] which fall[s] within the defined scope of the Carousel Landing project". Those comments were an inadequate response to the acute and immediate problems that will be a direct consequence of the proposed Carousel Landing Project. The fact that the oil storage tanks and pipelines would require relocation and reconstruction was hardly "speculative."

" 'Not every conceivable environmental impact, mitigating measure or alternative must be identified and addressed before a FEIS will satisfy the substantive requirements of SEQRA' * * * The degree of detail with which each factor must be discussed obviously will vary with the circumstances and nature of the proposal *(see, Webster Assoc. v Town of Webster,* 59 NY2d 220, 228)" *(Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 417, *supra).* Under the circumstances here, the SEQRA review should at least have considered the effects of rebuilding and relocating the tanks, terminals and pipelines *(see, Webster Assocs. v Town of Webster, supra,* at 227-228; *Matter of Segal v Town of Thompson, supra,* at 1045-1046; *Matter of Town of Henrietta v Department of Envtl. Conservation,* 76 AD2d 215, 220-221).

## Consideration of Alternatives to the
## Carousel Landing Project

Petitioners contend that the Preferred Developer Agreement precluded SIDA from considering reasonable alternatives to the Carousel Landing Project, including their proposal to consolidate their facilities on a portion of the site.

"SEQRA requires that an EIS discuss 'alternatives to the proposed action' (ECL 8-0109, subd 2, par [d]). This discussion, in both the draft and final EIS, must contain 'a description and evaluation of reasonable alternatives to the action which would achieve the same or similar objectives' (6 NYCRR 617.14 [f] [5])" *(Webster Assocs. v Town of Webster, supra,* at 227-228).

SIDA failed, however, to consider all the environmental ramifications of the Carousel Landing Project and failed to analyze reasonable alternatives to the Carousel Landing Project, particularly the proposal of the Oil Companies to consolidate their facilities on a portion of the site. As the letter from the Director of the Office of Lakefront Development made clear, SIDA was unable to consider other alternatives because it was bound by the terms of the Preferred Developer Agreement. The Preferred Developer Agreement bound SIDA to pursue a definite course of action, precluding meaningful consideration of other alternatives to Pyramid's proposed project. That is a clear failure to comply with SEQRA *(see,* ECL 8-0109 [2] [d]; 6 NYCRR 617.14 [f] [5]).

## Consideration of the Economic Impacts
## of Carousel Landing

SIDA's failure to address the economic impacts of the project on the over-all Syracuse economy did not violate SEQRA. Those impacts involved purely competitive economic factors, not environmental ones, and, therefore, were beyond the scope of SEQRA *(see, Society of Plastics Indus. v County of Suffolk,* 77 NY2d 761, 774; *Matter of Mobil Oil Corp. v Syracuse Indus. Dev. Agency,* 76 NY2d 428, 433, *supra; Matter of Wilder v New York State Urban Dev. Corp.,* 154 AD2d 261, 262, *lv denied* 75 NY2d 709).

## The Traffic and Air Quality Findings

Petitioners contend that the findings concerning the traffic and air quality impacts of the Carousel Landing Project were arbitrary and capricious and unsupported by substantial evidence. Essentially, petitioners take issue with SIDA's rejection of petitioners' data concerning the traffic and air quality impacts and the reliance by SIDA upon its own consultant's data.

"A lead agency * * * may rely upon the advice it receives from others, including consultants, if reliance is reasonable [citation omitted]" *(Matter of Stewart Park & Reserve Coalition v New York State Dept. of Transp.,* 157 AD2d 1, 7, *supra).* The scope of judicial review is "very limited" *(Matter of Orchards Assocs. v Planning Bd.,* 114 AD2d 850, 852, *appeal dismissed* 68 NY2d 808), and it is not a court's function to resolve the disparity in data presented to an agency. All that is required is that SIDA consider the data and give a reasoned response *(see, Akpan v Koch,* 75 NY2d 561, 572-573; *Matter of Morse v Town of Gardiner Planning Bd.,* 164 AD2d 336, 340-341). "That petitioners' expert disagrees with the studies used does not alter [the agency's] determination, since scientific unanimity need not be achieved" *(Matter of Schodack Concerned Citizens v Town Bd.,* 148 AD2d 130, 134, *supra).*

As the DEIS and FEIS make clear, SIDA considered the data underlying its findings concerning the impact of traffic and air quality, and we conclude that SIDA complied with SEQRA in making its findings *(see, Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 417, *supra).*

## V

### Conclusion

Accordingly, the determination and findings of SIDA should be rejected because of the failure of SIDA to make its determination and findings "in accordance with * * * article eight of the environmental conservation law" (EDPL 207 [C] [3]).

GREEN, J. P., BALIO, FALLON and CALLAHAN, JJ., concur.

Determination unanimously annulled, on the law, without costs, and petitions granted in accordance with the opinion by BOEHM, J.