■ In the Matter of Town of Coeymans, Appellant-Respondent, v City of Albany et al., Respondents-Appellants, et al., Respondents. (Proceeding/Action No. 1.) In the Matter of Linda E. Marshall et al., Appellants-Respondents, v City of Albany et al., Respondents-Appellants, et al., Respondents. (Proceeding/Action No. 2.) [728 NYS2d 797] —Lahtinen, J. Cross

appeals from two amended judgments of the Supreme Court (Ferradino, J.), entered February 4, 2000 and February 11, 2000 in Albany County, which, *inter alia,* denied petitioners' applications, in combined proceedings pursuant to CPLR article 78 and actions for declaratory judgment, to declare Ordinance No. 55.111.98 of the City of Albany null and void.

In 1989, several municipalities, including respondent City of Albany and petitioner Town of Coeymans in Albany County, adopted resolutions authorizing the creation of the Albany New York Solid Waste Energy Recovery System Waste Shed Planning Unit (hereinafter Planning Unit) to formulate a long-term plan for the disposal of solid waste. The City, as the Planning Unit's lead agency, formulated a solid waste management plan that respondent Common Council of Albany adopted on March 16, 1992. The plan identified landfills as the preferred method of waste management and recommended the construction of a new landfill. Thereafter, the City completed a multiphase siting study that initially identified 15 potential sites for the construction of the new landfill and finally selected a 343-acre parcel of property located in the Town, referred to as "Site C-2," as the preferred site.

During the siting process, the City engaged in extensive negotiations to obtain options to purchase the parcels of land comprising Site C-2. On August 15, 1994, the Common Council passed a resolution authorizing respondent Mayor of Albany "to execute and enter into purchase contracts and/or other agreements to facilitate the acquisition" of Site C-2 by the City.[1] Sixteen days later, the Mayor signed an option agreement for 201.6 acres of the site.

In the meantime, the City filed an application with the Department of Environmental Conservation (hereinafter DEC) for a permit to construct and operate a landfill at Site C-2. In March 1995, DEC concluded that the proposed landfill constituted a type I action under the State Environmental Quality Review Act (ECL art 8 [hereinafter SEQRA]), requiring coordinated review among all of the involved agencies, and designated DEC's Region 4 office as the lead agency for the project.[2] DEC thereafter issued a positive declaration for the project and outlined the parameters of a draft environmental impact statement that would have to be completed before the project could proceed. In 1997, the City obtained options to two additional parcels of real property which, together with the property covered by the 1994 option, comprise Site C-2.

---

1. Resolution No. 76.82.94R.

2. Petitioners' challenge to the designation was dismissed on ripeness grounds and affirmed by this Court (237 AD2d 856, *lv denied* 90 NY2d 803).

On November 16, 1998, the Common Council passed resolution No. 86.113.98R (hereinafter the resolution) authorizing "the funding of the acquisition of * * * Site C-2" to "ensure continued control" over the site. The Common Council also appointed itself as the lead agency for the acquisition of Site C-2, despite the prior designation of DEC's Region 4 office as the lead agency for the entire project, and issued a negative SEQRA declaration obviating the need to file an environmental impact statement. The Common Council then enacted City Ordinance No. 55.111.98 (hereinafter the ordinance), which authorized the issuance of $3,450,000 in City bonds to fund the purchase of the parcels comprising Site C-2.

The Town subsequently initiated a combined CPLR article 78 proceeding and action for declaratory judgment (hereinafter proceeding No. 1) against the City and various City agents and bodies (hereinafter collectively referred to as the City respondents) and the owners of the land that comprised Site C-2 (hereinafter collectively referred to as the landowner respondents) to annul the resolution and the ordinance. The Town alleged that the Common Council violated SEQRA by, *inter alia*, usurping the lead agency status of DEC's Region 4 office, illegally segmenting the funding portion of the project and issuing a negative declaration for funding purposes even though DEC had previously issued a positive declaration for the entire project.[3] Residents of the Town and the City (hereinafter collectively referred to as the Marshall petitioners) initiated a similar combined CPLR article 78 proceeding and action for declaratory judgment (hereinafter proceeding No. 2) against the City respondents and the landowner respondents, alleging that their actions violated SEQRA, General Municipal Law § 51 and Second Class Cities Law § 22.

Supreme Court agreed that the Common Council had violated SEQRA, rejected the City respondents' two principal defenses—that the Town and the Marshall petitioners lacked standing to bring both proceedings and that the proceedings were barred by the Statute of Limitations—and nullified the resolution. The City respondents appeal from this portion of Supreme Court's amended judgments in both proceedings. The court refused to invalidate the ordinance, however, reasoning that the bonds approved thereunder could ultimately be issued if DEC permits segmentation of the acquisition process. The Town and the Marshall petitioners cross-appeal from this portion of Supreme Court's amended judgments in both proceed-

---

**3.** The landowner respondents counterclaimed against the Town for "wrongful interference" with the purchase contracts.

ings. In addition, Supreme Court dismissed the Marshall petitioners' General Municipal Law § 51 and Second Class Cities Law § 22 claims in proceeding No. 2, prompting a cross appeal from that portion of the court's amended judgment in said matter.

Initially, we agree with Supreme Court that the Town and the Marshall petitioners who reside in the Town have standing to bring their respective SEQRA proceedings. We have previously stated that "standing should be liberally constructed so that land use disputes are settled on their own merits rather than by preclusive, restrictive standing rules" (*Matter of Parisella v Town of Fishkill*, 209 AD2d 850, 851). To that end, the allegations contained in a petition are deemed to be true and are construed in the light most favorable to the petitioner (*id.*, at 851). Applying those rules, we conclude that the Town and the Marshall petitioners who reside in the Town have shown that the Common Council's action will "have a harmful effect on [them] and that the interest asserted is arguably within the zone of interest to be protected by the statute" (*Matter of Dairylea Coop. v Walkley*, 38 NY2d 6, 9; *see*, *Matter of Mobil Oil Corp. v Syracuse Indus. Dev. Agency*, 76 NY2d 428, 433).

With respect to the Town, its petition/complaint in proceeding No. 1 alleges that the construction of a landfill at Site C-2 would violate a local law prohibiting the importation of solid waste into the Town as well as various Town zoning ordinances. It also alleges that an aquifer and other water resources are subject to potential contamination and that Town "public use facilities, such as schools * * * would be adversely affected by blowing trash, noise and odors, [and] infestations of vectors" because of their proximity to the proposed landfill. The alleged violations of local laws, coupled with the specific environmental concerns set forth in the pleadings, are sufficient to confer standing upon the Town because these alleged adverse effects are peculiar to the Town's role as a municipal agency and, therefore, "the harm [to the Town] is different from that of the public at large," i.e., an individual resident of the Town (*Matter of Parisella v Town of Fishkill*, *supra*, at 851).

Insofar as the Marshall petitioners who reside in the Town are concerned, we again agree with Supreme Court that they have SEQRA standing. The allegations that each lives in close proximity to the proposed project (*see*, *Matter of McGrath v Town Bd.*, 254 AD2d 614, 616, *lv denied* 93 NY2d 803), coupled with their allegations that they will be adversely affected by

the project (*see, e.g., Matter of Heritage Co. v Belanger*, 191 AD2d 790, 791; *Matter of Sopchak v Guernsey*, 176 AD2d 403) are "sufficient to create a presumption that [these petitioners] will be adversely affected in a way different from the public at large" (*Matter of McGrath v Town Bd., supra*, at 616). However, those Marshall petitioners who are residents of the City in proceeding No. 2 do not have standing to assert a SEQRA claim because they failed to allege that they will suffer an environmental injury.

The City respondents also argue that both proceedings are barred by the four-month Statute of Limitations applicable to allegations of SEQRA violations (*see, Matter of Young v Board of Trustees*, 89 NY2d 846, 848), claiming that the Town and the Marshall petitioners are really challenging the selection of Site C-2 in 1994 as the preferred site for the new landfill. We find this argument unpersuasive, however, because the 1994 resolution provided the Mayor with the authority to enter into "purchase contracts and/or other agreements to facilitate the acquisition" of Site C-2, but did not commit the Common Council to approving those agreements, providing the necessary funds to consummate them or attempting to segment the acquisition of Site C-2. We conclude that the limitations period was triggered when the Common Council committed itself "to a definite course of future activities" (*Matter of Wing v Coyne*, 129 AD2d 213, 217) by passing the November 1998 resolution and ordinance committing itself to segmentation and funding.

Turning to the question of segmentation, the City respondents argue that the decision to unilaterally segment the acquisition and funding of Site C-2 from the remainder of the project was proper because DEC is the "lead agency" only for the construction and operation portions of the project. Therefore, the City respondents contend that the Common Council had the authority to declare itself lead agency for acquisition and funding because no other involved agency had jurisdiction over those portions of the project. We disagree.

SEQRA "[a]ctions commonly consist of a set of activities or steps. The entire set of activities or steps must be considered the action" (6 NYCRR 617.3 [g]). When more than one agency is involved in an action, "a lead agency must be established prior to a determination of significance" (6 NYCRR 617.6 [b] [2] [i]). The term "lead agency" is defined as "an involved agency principally responsible for undertaking, funding or approving an action" (6 NYCRR 617.2 [u]). "The lead agency * * * continue[s] in that role until it files either a negative declaration or a findings statement or a lead agency is re-established" (6 NYCRR 617.6 [b] [2] [iii]).

Here, DEC's Region 4 office is the lead agency for the action (237 AD2d 856, *lv denied* 90 NY2d 803). DEC's positive decla-·ration of environmental significance describes the action as the "construction and operation of a municipal solid waste landfill * * * which will occupy approximately 50 +/- acres of a 363 acres [*sic*] site." The City respondents' argument—that "construction and operation" does not include "funding and acquisition"—is based upon an unreasonably restrictive read-ing of DEC's description of the project because a fundamental and necessary prerequisite to the act of construction is the acquisition of the *right to construct* on a particular parcel of property. Indeed, the resolution explicitly states that the acquisition of Site C-2 "is part of a larger action to construct and operate a landfill." Moreover, the regulations promulgated pursuant to SEQRA recognize that "[t]he entire set of activities or steps must be considered the action" (6 NYCRR 617.3 [g]) and nothing short of strict compliance satisfies SEQRA's requirements (*see, Matter of King v Saratoga County Bd. of Supervisors*, 89 NY2d 341, 347). As such, the acquisition of property rights to Site C-2 must be viewed as an integral part of a single project rather than as an independent action (*see generally, Sun Co. v City of Syracuse Indus. Dev. Agency*, 209 AD2d 34, 48-49, *appeal dismissed* 86 NY2d 776; *Matter of Brew v Hess*, 124 AD2d 962, 965). Consequently, Supreme Court cor-rectly concluded that the Common Council lacked the author-ity to declare itself to be the lead agency for funding and acquir-ing Site C-2 (*see*, 6 NYCRR 617.3 [g] [1]) and issue a negative SEQRA declaration for the acquisition process (*see*, ECL 8-0111 [6]). Therefore, the resolution was properly annulled.

We disagree, however, with Supreme Court's refusal to an-nul the ordinance. The ordinance states that "[i]t is hereby determined that the authority and funding of the acquisition of [Site C-2] constitutes a Type I Action" and that "the Action will not have a significant effect on the environment" as a result of "the reasons set forth in Resolution 85.112.98R." Since we have found that the Common Council lacked the authority to make these determinations, the underlying purpose of the· ordinance—purchasing Site C-2—is invalid. The facts of this case are not dissimilar to those cases that have dealt with the improper delegation of lead agency powers to involved agencies (*see, e.g., Matter of Martin v Koppelman*, 124 AD2d 24; *Matter of Save the Pine Bush v Planning Bd.*, 96 AD2d 986, *lv denied* 61 NY2d 602, *appeal dismissed* 61 NY2d 668), which resulted in the annulment of any action taken, including the authoriza-tion of a bond resolution, in reliance upon such improper delegation of authority (*see, Matter of Martin v Koppelman*,

*supra,* at 27-28). Accordingly, Supreme Court should have annulled the ordinance.

Finally, Supreme Court properly dismissed the General Municipal Law § 51 and Second Class Cities Law § 22 claims in proceeding No. 2. General Municipal Law § 51 and Second Class Cities Law § 22 are "fraternal-twin causes of action" (*Montecalvo v City of Utica,* 170 Misc 2d 107, 110, *affd* 233 AD2d 960, *appeal dismissed* 89 NY2d 938). "While there must be specific allegations of waste tied to official corruption, it is also clear that allegations of illegality alone are insufficient and any expenditure of funds must be for entirely illegal purposes [citations omitted]" (*id.,* at 111; *see, Gaynor v Rockefeller,* 15 NY2d 120, 133-134). The petition/complaint in proceeding No. 2 alleges that the City respondents violated these statutes because they agreed to pay "a grossly excessive price" for Site C-2—approximately 24 times its fair market value—without obtaining an appraisal. Significantly, however, the petition/complaint does not allege that City officials acted corruptly or that City funds will be used for illegal purposes. In the absence of allegations of corrupt motive and illegal purpose, the petition/complaint is facially insufficient (*see, Gaynor v Rockefeller, supra,* at 133-134; *Montecalvo v City of Utica, supra,* at 111).

Crew III, J. P., Spain and Mugglin, JJ., concur. Ordered that the amended judgments are modified, on the law, without costs, by declaring that Ordinance No. 55.111.98 of the City of Albany is null and void, and, as so modified, affirmed.